SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

### State of New Jersey v. Dwayne E. Slaughter (A-134-11) (070372)

**Argued September 10, 2013 -- Decided August 12, 2014**

**RODRÍGUEZ, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

In this appeal, the Court considers whether the admission at trial of an available witness's prior recorded police statement without giving defendant the opportunity to cross-examine the witness in front of the jury violated defendant's constitutional confrontation rights and, if it did, whether the violation constituted harmful error.

Roosevelt Morrow (Morrow) was found dead in his home. His death was caused by multiple blunt force injuries to the head. Law enforcement officers were unable to identify the assailant based on the physical evidence found at the crime scene. As the investigation progressed, the investigators began to focus on Morrow's neighbor, defendant Dwayne E. Slaughter. Four days after the homicide, defendant's live-in girlfriend, Tanisha Day, consented to give a sworn taped statement to the police. Day described her interactions with defendant on the day of Morrow's death, including: "And I was asking him again what did he do. And he said he hope he didn't kill this n---a"; which Day said she took to mean that "he had beaten somebody up." Day also noted that defendant had blood on his pants and was with Pritchard Watts on the day in question. Defendant and Watts thereafter both admitted to police that they were present in Morrow's home during the crime; however, each blamed the other as being the sole actor in the beating of Morrow. Although defendant stated that he was wearing the same jeans he wore on the day of the crime, the DNA on the jeans did not match Morrow's.

Pursuant to a plea agreement, Watts pleaded guilty to first-degree robbery in exchange for a recommended sentence, and agreed to testify against defendant. Watts testified that he and defendant planned to rough up and rob Morrow, who operated a store out of his home. According to Watts, they gained entry to Morrow's home by stating that they wanted to purchase sodas, after which Watts hit Morrow and proceeded to the bedroom to look for money. Upon exiting the bedroom, he saw defendant beating Morrow, who was on the floor bleeding. Watts told defendant to stop and they left shortly thereafter. Watts claimed that it was not supposed to happen that way. Watts also testified that he and defendant exchanged letters while being held in the same jail. The letters, which were read to the jury, implicated defendant. Defendant provided a different version of the incident. Defendant testified that he and Watts went to Morrow's home because Watts wanted a soda. According to defendant, he remained outside smoking a cigarette while Watts went inside. Several minutes later, after hearing "a loud noise and . . . [Morrow] scream out," defendant entered the house to find Watts beating Morrow. Watts then proceeded to the back room to look for money before the two men left. Defendant also testified that he did not communicate with Watts while in jail. Finally, defendant clarified his conversation with Day on the day in question, testifying that he meant "[he] hoped [Watts] didn't kill [Morrow]."

At trial, the State sought to admit Day's recorded statement to the police. The judge conducted an N.J.R.E. 104 hearing, outside the presence of the jury, to determine the statement's admissibility. At the hearing, Day testified that although she remembered giving a statement to the police, she did not remember what defendant said to her or what happened the day of the homicide. The judge determined that Day's loss of memory was feigned and that the statement was admissible pursuant to State v. Brown, 138 N.J. 481 (1994), overruled on other grounds by State v. Cooper, 151 N.J. 326 (1997). The judge ordered that Day did not have to testify or be present at trial when her statement would be admitted in evidence. The jury ultimately found defendant guilty of first-degree aggravated manslaughter, second-degree conspiracy, and second-degree aggravated assault. The court denied defendant's motion for a new trial.

The Appellate Division affirmed defendant's convictions. The panel concluded that although the trial judge did not err in finding the witness's lack of memory was feigned, the trial court erred in allowing Day's audiotaped statement to be played to the jury without requiring her to testify in front of the jury. The panel,

1

however, concluded that any error was harmless. The Court granted defendant's petition and summarily remanded the matter to the Appellate Division for reconsideration in light of State v. Cabbell, 207 N.J. 311 (2011). Upon reconsideration, the Appellate Division again concluded that the trial court's error was harmless beyond a reasonable doubt. The Court granted defendant's petition for certification. 211 N.J. 608 (2012).

**HELD**: The playing of the available witness's audiotaped police statement to the jury without requiring the witness to testify in front of the jury violated defendant's constitutional confrontation rights, and that violation constituted harmful error.

1. In criminal proceedings, the United States Constitution protects defendants against the use of out-of-court testimonial statements. See generally Crawford v. Washington, 541 U.S. 36 (2004). The intersection of the protections of the Confrontation Clause and the use of prior inconsistent statements has been explained twice by this Court. In State v. Brown, 138 N.J. 481 (1994), the Court recognized that "constitutional confrontation guarantees are not violated by a witness's lack of recollection regarding an introduced prior statement or the events described in such a statement." Id. at 544. In Cabbell, due to the constitutional implications to the admission of a prior inconsistent statement due to feigned memory, the Court explained that in order to satisfy constitutional confrontation guarantees, the jury must observe the witness and make a decision about which account is true. Cabbell, 207 N.J. at 336-37. Therefore, a trial court may admit prior inconsistent witness statements so long as "the witness feigns a loss of memory on the stand." Id. at 337 (emphasis added). (pp. 17-28)

2. In Cabbell, the State presented a witness to testify who had previously provided a recorded statement to the police. Id. at 319. After the witness stated on the stand that she did not want to testify, the court conducted a N.J.R.E. 104 hearing to determine the admissibility of her prior recorded statement. Ibid. At the hearing, the witness answered either "I don't remember" or "I wish not to testify" to most questions, and claimed that she was under the influence of crack cocaine when she witnessed the crime and gave her statement. Id. at 320. The trial court admitted the witness's prior recorded statement as a past recollection recorded. Id. at 321. This Court found that the trial court committed a constitutional error that was harmful and reversible when it admitted the witness's statement without requiring her to take the stand, thereby thwarting defense counsel's opportunity to cross-examine her in the jury's presence. Id. at 330-33, 335-39. The Court "refuse[d] to speculate . . . that the jury rejected [the witness's] statement," and noted that she was the only witness who identified a particular defendant as a shooter. Id. at 338. The Court also noted that because defense counsel did not have an opportunity to cross-examine the witness, the jury never heard her testimony about her memory being affected by crack cocaine. Id. at 332. Where the trial court commits a constitutional error, that error is to be considered "a fatal error, mandating a new trial, unless [the court is] 'able to declare a belief that it was harmless beyond a reasonable doubt.'" Id. at 338 (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). "'[T]he question is whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction.'" State v. Dennis, 185 N.J. 300, 302 (2005) (quoting Chapman, 386 U.S. at 23-24), cert. denied, 547 U.S. 1045 (2006). (pp. 18-20).

3. The admission of Day's audiotaped statement without requiring her to testify in front of the jury violated defendant's confrontation rights. Under the circumstances of this case, the Court cannot conclude the error was harmless beyond a reasonable doubt. There was no physical evidence linking defendant to the beating, and there was no objective corroboration of the State's theory of the case. The case turned directly on the diametrically opposed testimony of defendant and Watts, and Day's audiotaped statement could well have tipped the scale in favor of Watts's account of the incident. Day's statement using the term "he" could be interpreted to refer to either Watts or defendant. While one interpretation could have exonerated defendant, a more likely meaning is that defendant had referred to himself as the culprit. Nevertheless, it was error to admit this ambiguous statement without subjecting Day -- whose choice of language created the ambiguity -- to cross-examination before the jury. This error denied defendant a crucial avenue of clarification as well as confrontation. Although Day did not reveal any facts, such as intoxication, that undermined her statement, cross-examination would have allowed counsel to explore her state of mind at the time and the jury to assess her demeanor and credibility. The State's theory of the case rested heavily on Day's out-of-court statement and the Court cannot declare the erroneous admission of that statement harmless. (pp. 21-23)

The judgment of the Appellate Division is **REVERSED**, defendant's convictions are **VACATED**, and the matter is **REMANDED** for a new trial.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and PATTERSON; and JUDGE CUFF (temporarily assigned) join in JUDGE RODRÍGUEZ's opinion.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

      v.

DWAYNE E. SLAUGHTER,

    Defendant-Appellant.

Argued September 10, 2013 – Decided August 12, 2014

On certification to the Superior Court,
Appellate Division.

Robert L. Sloan, Assistant Deputy Public
Defender, argued the cause for appellant
(Joseph E. Krakora, Public Defender,
attorney).

Teresa A. Blair, Deputy Attorney General,
argued the cause for respondent (John J.
Hoffman, Acting Attorney General of New
Jersey, attorney).

JUDGE RODRÍGUEZ (temporarily assigned) delivered
the opinion of the Court.

Following a jury trial, defendant, Dwayne E. Slaughter, was
convicted of aggravated manslaughter, conspiracy, and aggravated
assault. These charges arose from the brutal beating of
defendant's seventy-nine-year-old neighbor, Roosevelt Morrow
(Morrow). Defendant's live-in girlfriend, the mother of his
three children, Tanisha Day, gave an audiotaped statement to

1

investigators days after Morrow's death, in which she attributed an incriminating remark to defendant. Day's statement was admitted at trial. However, she did not testify, although she was available to do so.

The issue in this case is whether, consistent with the Confrontation-Clause requirements of the United States and New Jersey Constitutions, reversal of defendant's convictions is required because Day's statement was admitted at trial and she was not available for cross-examination. We conclude that the admission of Day's statement violated defendant's confrontation rights and that this violation constituted harmful error. We vacate defendant's convictions and remand the matter to the Law Division for a new trial.

I.

A.

On June 19, 2005, in the mid-afternoon, Morrow's lifeless body was discovered by his wife Callie Mae Morrow (Callie Mae) inside their Salem City home. He had been struck repeatedly on the head with a blunt instrument.

The following evidence was presented at trial. Callie Mae testified that as she left for work around 5:15 a.m., she saw defendant around the corner from her home. She had known defendant for a long time because he frequently bought

2

cigarettes from her husband, who operated a store from their home.

Callie Mae testified that although Morrow regularly called her on workdays at around 9:00 a.m., he did not do so that day. Therefore, Callie Mae telephoned her husband at around 9:30 a.m., but received no answer. Becoming concerned, she continued to call, but did not reach him. Around 3:15 p.m., she left work to go home.

Callie Mae testified that she arrived home and found the front porch door open but the inner door locked. Once inside, she discovered the home had been ransacked. She found her husband's lifeless body lying on the living room floor in a pool of blood. Morrow's money clip was missing as were his two canes, one metal and one wood. Callie Mae went outside her house screaming. The Morrows' neighbor, Laura Brown, responded to Callie Mae's screams, went to comfort her and called 9-1-1.

Paramedic John F. Ruhl arrived at the scene and saw Morrow's body "laying face down on the floor with an obvious injury to the head, . . . not moving, . . . unconscious and unresponsive[.]"

Medical Examiner Dr. Gerald Feigel opined that Morrow's death was caused by "multiple blunt force injuries to the head." According to Ruhl, Morrow had a number of abrasions and lacerations on, as well as internal damage to, the head.

3

Salem County Prosecutor's Detective Jeffrey Scozzafava, who was assigned to the forensic investigation unit, qualified as an expert in the field of bloodstain pattern analysis. He identified five footwear impressions on Morrow's shirt, four from a work boot and one from a sneaker. According to Detective Scozzafava, a suspect's shoe came in contact with blood and the suspect then stepped on the shirt. There were other bloodstains found on Morrow's shirt, which were likely spattered on Morrow while he was lying on the floor. All the blood samples taken at the crime scene matched Morrow's blood.

Police investigators also obtained one fingerprint from the crime scene. However, the fingerprint had no match in the Automated Fingerprint Identification System.

B.

As the investigation progressed, the Salem County Prosecutor's Office began to focus on defendant. Senior Investigator Steven Dick interviewed defendant's live-in girlfriend, Day, who initially provided no useful information. After further investigation, Investigator Dick and his partner returned to defendant and Day's home for a second interview on June 23, 2005, four days after the homicide. She consented to a search of the home.

According to Investigator Dick, Day's story had changed from their first conversation. She was taken to headquarters to

4

continue the interview.  Day consented to give a sworn taped
statement.  In her audiotaped statement, Day described her
interactions with defendant on the day of Morrow's death.  In
reference to defendant's conduct, the following exchange took
place.

[POLICE OFFICER]:  Okay.  And can you just explain to us exactly ah, how that occurred?

[TANISHA DAY]:  He came in, he told me to go upstairs and get the kids, put 'em in my room.  I went upstairs, I went in my kids' room, my son was still 'sleep, but my youngest daughter was awoke.  I took her in my bedroom, we layed across the bed and I slightly fell asl, fell asleep.  And wo, I opened my eyes and he was standing in front of me and asked him what did he do.  And he didn't say anything, an, I asked him again and he told me to shut up, shush, be quiet.  And then I asked him again and then he turned around, he started taking the clothes off.  I got up, put my daughter back in her room and I went downstairs and I sat on a chair, nervous.  Got up, I looked out the window, I didn't see anybody.  I opened the door, I cracked it, looked out the door and I didn't see anything and went and sat back down.  I went back, got up, and went upstairs again.  And I went in, I went in the room, in my bedroom.  And I was asking him again what did he do.  And he said he hope he didn't kill this n---a.

Q:  What did you, what did you take him to mean by saying that?

A:  That he had beaten somebody up.

Q:  Was there anybody else with him at the time?

A:  Yes.

5

Q:   Who was that?

A:   Pritchard Watts.

[emphasis added.]

Day also stated that she had noted that defendant had blood on his pants when he entered the home the day on which the reported exchange took place.

The next day, defendant and Watts were asked to come to headquarters to meet Investigator Dick. Defendant provided a sworn statement. After giving the sworn statement, defendant spoke with his mother and grandmother. Defendant then told Investigator Dick that he was sorry for lying and wanted to tell the police, truthfully, what had happened. Defendant provided a second sworn statement, during which he admitted that he was wearing the same jeans he wore on the day of the incident. The police tested the jeans for DNA. At trial, the prosecutor stipulated that the DNA on the jeans matched defendant's, not Morrow's.

Defendant gave a third statement to the investigators admitting in this statement that he was present during the beating of Morrow, but that he did not participate in it and that Watts was the sole assailant.

Watts, in contrast, did not provide a sworn, taped, or written statement. The police spoke informally with Watts on

6

two occasions. During the first interview, Watts denied any knowledge of the incident. Later, when Watts spoke with the police, he admitted that he was there and also placed defendant at the scene. Watts's statement to the police directly contradicted defendant's, i.e., Watts admitted being present during the beating but accused defendant of being the only actor.

Pursuant to a plea agreement, Watts pleaded guilty to first-degree robbery in exchange for a recommendation that any sentence would not exceed a ten-year term subject to a minimum term pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Watts then testified for the State at defendant's trial.

C.

At trial, Watts testified that sometime in the early morning of June 19, 2005, he saw defendant at Day's home. According to Watts, defendant told him that Morrow had $150,000 and suggested that they should rob him. Watts agreed. The plan was for both men to rough up Morrow.

Watts testified that when he and defendant arrived at Morrow's home, Watts went in through the screen door, followed directly by defendant. Watts stated that he knocked on the door and Morrow invited him into the house. At that point, Morrow

7

was seated in a chair in the living room and defendant was on the porch smoking a cigarette.

Watts testified that he asked to purchase two sodas. He stated that as Morrow went to retrieve the sodas, defendant entered the home and stood next to Watts. Watts testified that he then punched Morrow in the face, and he fell to the floor, and that as Morrow began to get up, defendant kicked him in the head or face. According to Watts, Morrow fell face first and then moved, "scrambling, trying to get up." Watts went to the bedroom for three to five minutes to look for the money. As he was looking through the drawers, he heard defendant tell Morrow to stay down. Watts testified that as he exited the bedroom, he saw defendant kicking Morrow. He also saw defendant hit Morrow with a wooden object, causing a piece of the object to fly off.

Watts testified that he told defendant to stop and that he was leaving the house. When Watts left, he saw that Morrow was on the floor bleeding. Watts said that he took a box of cigars with him as he left and that defendant left the home soon after. Watts testified that he did not see defendant carrying anything from Morrow's home. He stated that both men returned to Day's house. Watts said he saw blood on defendant's right pant leg and told defendant about it.

According to Watts, the day after the incident, he spoke with his girlfriend Chanelle Armstead and told her that "it

8

wasn't supposed to happen that way, and that [he (Watts)] didn't kill [Morrow]." The only other information Watts provided was that he hit Morrow. Further, according to Watts, he was only in the living room and bedroom of the home.

Watts also testified that on June 20, 2005, defendant telephoned him to tell him that Morrow had died. Watts said that he advised defendant to maintain his routine so he would not look suspicious. According to Watts, defendant was taken to jail between a half hour to an hour after Watts had arrived in jail. Watts said he signaled to defendant that he was going to write him and that defendant should write back. At Watts's request, another inmate delivered letters to defendant. While he did not actually see the cell number where the inmate slipped the letters, Watts saw the inmate bend down and slide the letter under a cell door. According to Watts, defendant wrote letters in return. The letters, which were read to the jury, implicated defendant. Watts identified the handwriting as defendant's.

Defendant testified on his own behalf and gave a different version of events. According to defendant, at the time of the incident, he was living with his girlfriend, Day. On the morning of June 19, 2005, he went to Morrow's home to buy a cigar. He had gone there previously to buy cigars or cigarettes and had known Morrow since he was a child. He was only in the Morrows' residence for about a minute and then went back to his

9

girlfriend's house. Watts arrived soon thereafter, and defendant and Watts went outside to smoke marijuana for approximately a half hour.

At the time, according to defendant, he was wearing "a pair of blue NBA basketball team jeans, a pair of white blue and gray Nike Air Max sneakers and a white tank top."  Defendant testified that Watts was wearing "a pair of wheat colored construction boots, a pair of blue jean shorts, a black t-shirt and a black baseball cap."

While it was still early in the morning, defendant and Watts returned to Morrow's home because Watts wanted a soda. When they arrived, defendant remained outside smoking a cigarette while Morrow let Watts inside to buy sodas.

Defendant testified that he was outside for three to four minutes before going inside.  He went into the living room after he heard "a loud noise and . . . heard [Morrow] scream out." Defendant saw Watts stomping on Morrow's face.  When Morrow attempted to turn over and crawl away, Watts kicked him in the head and shoulder area.  Defendant told Watts to stop.  Watts stopped when Morrow passed out.  Watts then jumped over Morrow and went into the back room.

Defendant yelled at Watts to "come on" and that they "had to leave."  Watts came out of the room after a minute or two, with a wallet in his hand.  Defendant knocked the wallet out of

10

Watts's hand, and they both returned to defendant and Day's house. Day, defendant's children, and Armstead were all at the home when defendant and Watts arrived.

According to defendant, he and Watts went into the kitchen to speak. Defendant testified that he asked Watts what had happened and also told Watts that he had blood on his face. According to defendant, when he and Watts were speaking in the kitchen, defendant's daughter and Day awoke. Defendant told Day to bring their daughter upstairs and he followed Day into the upstairs bedroom. At the same time, Watts went into the bathroom and also called Armstead to meet him there.

Defendant clarified his conversation with Day, testifying that he meant "[he] hoped [Watts] didn't kill [Morrow]." According to defendant, after that conversation, defendant and Watts left in Armstead's car and drove around for about twenty to thirty minutes. According to defendant, while he was in jail he did not communicate with Watts in any way.

At trial, the State sought to admit the statement Day made to police. The judge conducted an N.J.R.E. 104 hearing, outside the presence of the jury, to determine the admissibility of Day's statement. At the hearing, Day testified that although she remembered giving a statement to the police, she did not remember what defendant said to her or what happened the day of the homicide. After questioning by the judge, she remembered

11

certain, mostly irrelevant, facts surrounding the taking of her statement.

The judge determined that Day's loss of memory was feigned and that the statement was admissible pursuant to State v. Brown, 138 N.J. 481 (1994), overruled on other grounds by State v. Cooper, 151 N.J. 326 (1997). The judge ordered that Day did not have to testify or be present at trial when her statement would be admitted in evidence.

The jury found defendant guilty of first-degree aggravated manslaughter, second-degree conspiracy and second-degree aggravated assault. The judge imposed concurrent terms aggregating twenty years subject to a NERA minimum term. Defendant moved for a new trial, which the court denied.

D.

Defendant appealed his convictions. In an unpublished opinion, the Appellate Division affirmed. The panel concluded that the trial court erred in allowing Day's audiotaped statement to be played to the jury without requiring the declarant to testify in front of the jury. The panel concluded that the trial judge did not err in finding the witness's lack of memory was feigned, nonetheless, defendant was denied his right to confrontation because the witness never testified to her lack of memory in front of the jury. Notwithstanding that determination, the panel concluded that any error was harmless.

12

Defendant petitioned for certification.  We granted the petition and summarily remanded the matter to the Appellate Division for reconsideration in light of our decision in State v. Cabbell, 207 N.J. 311 (2011).  State v. Slaughter, 212 N.J. 568 (2011).

Upon reconsideration, the Appellate Division again concluded that the trial court's error was harmless beyond a reasonable doubt.  Defendant again petitioned for certification. We granted the petition.  State v. Slaughter, 211 N.J. 608 (2012).

## II.

On appeal, defendant contends that the judge's admission of a recorded statement, from a crucial witness who did not testify at defendant's trial, violated his confrontation and due process rights and deprived him of a fair trial.  U.S. Const. amends. V, VI, XIV; N.J. Const., Art. I, ¶¶ 1, 9, 10.  He argues that the Appellate Division was mistaken when it determined that the admission of Day's statement, without the ability to cross-examine her, was harmless beyond a reasonable doubt.  According to defendant, the United States Supreme Court has long "recognized that the right to confrontation must be vindicated before the jury" (citing Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); Douglas v. Alabama,

13

380 U.S. 415, 419-20, 85 S. Ct. 1074, 1077, 13 L. Ed. 2d 934, 937-38 (1965).

Defendant argues that Day's testimony, if it had been subject to cross-examination, could have persuaded the jury to discount her statement to the police.  Therefore, he argues the failure to allow cross-examination in front of the jury was reversible error.  To support this contention, defendant relies on the recently decided case of State v. Cabbell.  In discussing Cabbell, defendant emphasizes that "[w]ithout cross-examination before the jury, the defendant had no opportunity to challenge the statement with the witness's drug use and prior record, 'or to probe into any other area that might have affected her credibility in the eyes of the jury.'"  Cabbell, supra, 207 N.J. at 332.

Defendant argues that the facts presented here are "nearly identical" to those of Cabbell and, therefore, the Court should rely on Cabbell to conclude that reversal is necessary.  According to defendant, "[t]he statement directly contradicted the defense's claim that the co-defendant was solely responsible for the victim's death."  Day made inculpatory statements against defendant, including one in which defendant said "he hoped he did not kill [Morrow]."  Defendant argues that if Day had testified, cross-examination of the witness "could have persuaded the jury to discount her statement to the police,

14

which described defendant's incriminating statements and the presence of blood on his pants."

The State argues that even if the admission of Day's statement was erroneous, it was nonetheless harmless. The State argues each of the purported inculpatory statements "actually proved nothing against defendant that was not already before the jury." The State explains that the blood evidence found on defendant's pants was cumulative to other evidence. Further, defendant admitted to being at the scene, so the fact that he may have had blood on his pants proved very little. The State also maintains that the statement that "'he said he hope he didn't kill this [person]' was so 'fraught with ambiguity' as to be rendered meaningless."

The State contends that "the Appellate Division properly ruled that admission of Day's sworn police statements at trial without Day testifying and being cross-examined before the jury was harmless beyond a reasonable doubt."

The State further argues that under any circumstances, Day's audiotaped statement would have been admitted and considered by the jury. The State proposes that it was better for defendant not to have Day testify, because then defendant could have provided his own explanation of the statement attributed to him. In the alternative, if Day had testified, she either would have explained that the statement referred to

15

defendant's fear that he killed Morrow, or she may have claimed Watts committed the crime, and then the State could have explored her potential bias.

Acknowledging that "this case was a credibility contest between defendant and his cousin, Watts," the State argues that "Day's statement offered nothing more in support of either the robbery or Morrow's death." The State argues that the letters defendant wrote merely stated the fact that defendant had blood on his pants. This evidence was thus cumulative.

Further, the State contends that Day's testimony is inconsequential due to its apparent ambiguity: defendant's statement that "he said he hope he didn't kill this [person]," was vague. Day never clarified who "he" was and instead focused on "this [person]." "He" could refer to either defendant or Watts. The State emphasizes that defendant himself testified that he said he hoped Morrow did not die. Thus, the State maintains that there is apparently little difference between those statements attributed to defendant by Day and the testimony provided by defendant at trial.

Notwithstanding the ambiguity in the statement, the State argues that the judge provided an instruction to the jury that they should be cautious when dealing with Day's statement and the jury is presumed to have followed this instruction.

16

Finally the State distinguishes the holding in Cabbell, arguing that, in that case, the witness was the only eyewitness identifying the defendant as the shooter. Additionally, in Cabbell, there were numerous inconsistencies in the record, unlike, the State contends, this case.

### III.

In criminal proceedings, the United States Constitution protects defendants against the use of out-of-court testimonial statements. See generally Crawford, supra, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (outlining parameters of admissibility of testimonial hearsay evidence). As Crawford explains, the Confrontation Clause of the United States Constitution bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53-54, 124 S. Ct. at 1365, 158 L. Ed. 2d at 194.

The intersection of the protections of the Confrontation Clause and the use of prior inconsistent statements has been explained twice by this Court. In Brown, supra, 138 N.J. 481 (1994), the Court originally recognized that "constitutional confrontation guarantees are not violated by a witness's lack of recollection regarding an introduced prior statement or the events described in such a statement." 138 N.J. at 544.

17

More recently, this Court reaffirmed that holding in Cabbell, supra, 207 N.J. at 336. Due to the constitutional implications to the admission of a prior inconsistent statement due to feigned memory, the Court explained that in order "[t]o satisfy constitutional confrontation guarantees . . . '[t]he jury . . . must observe the witness and make a decision about which account is true.'" Id. at 336-37 (quoting Brown, supra, 138 N.J. at 544). Therefore, a trial court may admit prior inconsistent witness statements so long as "the witness feigns a loss of memory on the stand." Id. at 337 (emphasis added).

In Cabbell, Timyan Cabbell and John Calhoun were indicted on numerous charges, including murder. Id. at 319. The key issue in the case was the identity of the shooters. Ibid. The State presented Karine Martin as a witness to testify to the issue of identity. Ibid. When called to the stand, Martin admitted that she gave the police a truthful statement, but then said she did not want to testify. Ibid.

Martin had previously provided a recorded statement to police about the incident. Id. at 317-18. The trial court conducted a N.J.R.E. 104 hearing to determine the admissibility of Martin's statement. Ibid. At the hearing, Martin responded either "I don't remember" or "I wish not to testify" to the majority of questions. Id. at 320. When the prosecution attempted to refresh her recollection with her statement, she

18

said "she was under the influence of crack cocaine [w]hen [s]he gave the statement and when [she] saw what happened." Ibid. (alterations in original) (internal quotation marks omitted).

The trial court decided to admit Martin's statement as a past recollection recorded. Id. at 321. Defense counsel objected, arguing that he was not provided an opportunity to cross-examine the witness before the jury. Ibid. The judge overruled the objection and the statement was read to the jury. Id. at 322. In the statement, Martin identified Cabbell as the one who shot the passenger in the truck. Ibid. Martin stated that Calhoun began firing after the passenger was shot. Ibid.

This Court held the trial court erred in admitting Martin's statement without her taking the stand in the presence of the jury. Id. at 330-33, 335-37. After finding a constitutional error, the Court turned to the issue of whether the error was harmless. Id. at 337-38. The Court "refuse[d] to speculate . . . that the jury rejected Martin's statement." Id. at 338. The Court noted that she was the only witness who identified defendant Cabbell as the shooter, and the other eyewitnesses' testimony was inconsistent with Martin's description; neither witness identified Cabbell. Ibid. Thus, because defense counsel did not have an opportunity to cross-examine Martin, the jury never heard Martin's testimony about her memory being

affected by crack cocaine at the time of the incident and making the statement to the police.  Id. at 332.

Moreover, where the trial court commits a constitutional error, that error is to be considered "a fatal error, mandating a new trial, unless we are 'able to declare a belief that it was harmless beyond a reasonable doubt.'"  Id. at 338 (quoting Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705, 710-11 (1967)).  "'[T]he question is whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction.'"  State v. Dennis, 185 N.J. 300, 302 (2005) (quoting Chapman, supra, 386 U.S. at 23-24, 87 S. Ct. at 827-28, 17 L. Ed. 2d at 710-11), cert. denied, 547 U.S. 1045, 126 S. Ct. 1624, 164 L. Ed. 2d 342 (2006).

We note that the majority of cases in which the Court has held errors to be reversible are those in which, upon a retrial, the proffered statement or testimony would nonetheless be inadmissible.  See, e.g., State ex rel. J.A., 195 N.J. 324, 351-52 (2008) (finding reversible error where court allowed officer to testify to eyewitness's account of robbery, as testimony was hearsay); State v. Sanchez, 129 N.J. 261, 278 (1992) (finding reversible error where court admitted defendant's uncounseled statement against self-interest); State v. McCloskey, 90 N.J. 18, 29-32 (1982) (finding reversible error because admission of

20

statements made by defendant while in custody violated his right against self-incrimination); State v. Boratto, 80 N.J. 506, 522-25 (1979) (finding reversible error where court admitted co-defendant's extrajudicial confession implicating defendant). Under those circumstances, it is readily discernable that an error is reversible because without the error the jury never would have heard the inadmissible testimony.

IV.

Defendant admitted that he was present at the scene of the crime, but portrayed his participation in the incident to be limited. Watts's testimony was diametrically opposed to defendant's. Watts admitted that he had a motive to steal money and objects from Morrow, by force, if necessary, but he denied beating Morrow. There was no physical evidence linking defendant to the beating. The police did not match defendant's shoes to the marks found on Morrow's shirt, or match defendant's DNA to the blood found at the scene. There was also no objective corroboration of the State's theory of the case.

Without Day's statement, this case turned directly on the conflicting testimony of defendant and Watts. Therefore, Day's statement could well have "tipped the scale" in favor of Watts's account of the incident.

The pretrial review of Day's audiotaped statement reveals at least two possible meanings. One interpretation could have

21

exonerated defendant.  A more likely meaning inculpated defendant.  After Day recounted what defendant had told her -- "And he said he hope he didn't kill this [person]" -- the police asked Day what she thought defendant meant by the statement. She replied, "that he had beaten somebody up."  (Emphasis added).  In that context, it would be reasonable for the jury to conclude that defendant had referred to himself as the culprit. Day also stated that she saw blood on defendant's pants, which could likewise implicate him.  Thus, it was error to admit this ambiguous statement without subjecting Day -- whose choice of language created the ambiguity -- to questioning before the jury.

The State argues that Day's statement was ambiguous and thus could not have provided a basis to find defendant guilty. However, as stated earlier, the ambiguous statement was capable of at least two meanings, one of which directly inculpated defendant.  Admitting the statement without subjecting Day to cross-examination denied defendant a crucial avenue of clarification as well as confrontation.

In Cabbell, supra, the Court found reversible error based on the admission of an arguably otherwise admissible statement, because the trial court did not allow defense counsel the opportunity to cross-examine the declarant in front of the jury. 207 N.J. at 337-39.  In Cabbell, the fact that the witness's

22

statement would have otherwise been included as a past recollection recorded was not dispositive; the Court still held that the jury should have had an opportunity to hear cross-examination.  This was especially true considering the fact that on cross-examination during the N.J.R.E. 104 hearing the witness testified that she was on  crack cocaine during the incident and while giving her statement to police.  Id. at 331.

Day did not reveal any facts, such as intoxication, that undermined her statement.  But cross-examination would have allowed counsel not only to explore her state of mind at the time but also to probe for bias.  Of great import as well, the jury was deprived of a chance to assess her demeanor and credibility.

The State's theory of the case rested heavily on Day's out-of-court statement.  Under the circumstances, we cannot declare that the erroneous admission of that statement was "harmless beyond a reasonable doubt."  Chapman, supra, 386 U.S. at 24, 87 S. Ct. at 828, 17 L. Ed. 2d at 710-11.

V.

The judgment of the Appellate Division is therefore reversed.  Defendant's convictions are vacated and the matter is remanded for a new trial.

CHIEF JUSTICE RABNER, JUSTICES LaVECCHIA, ALBIN, and PATTERSON, and JUDGE CUFF (temporarily assigned) join in JUDGE RODRÍGUEZ's opinion.

23

SUPREME COURT OF NEW JERSEY

NO.    A-134                          SEPTEMBER TERM 2011

ON CERTIFICATION TO          Appellate Division, Superior Court


STATE OF NEW JERSEY,

        Plaintiff-Respondent,

                v.

DWAYNE E. SLAUGHTER,

        Defendant-Appellant.



DECIDED              August 12, 2014
                   Chief Justice Rabner                          PRESIDING
OPINION BY              Judge Rodríguez
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY


| CHECKLIST | REVERSE/ VACATE/ REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |

1