**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0508-18T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DONALD WATKINS, a/k/a
MICHAEL WATKINS,

     Defendant-Appellant.

_____

Argued February 10, 2020 – Decided April 30, 2020

Before Judges Fasciale and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 13-08-2592.

Oleg Nekritin, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robert J. De Groot, Designated Counsel, and Oleg Nekritin, on the brief).

Daniel A. Finkelstein, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Daniel A. Finkelstein, of counsel and on the brief).

PER CURIAM

Defendant appeals from his conviction by jury and sentence for one count of third-degree threat to kill, N.J.S.A. 2C:12-3(b) (count one); three counts of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (counts two, three and four); three counts of third-degree aggravated assault with deadly weapon, N.J.S.A. 2C:12-1(b)(2) (counts five, six and seven); three counts of fourth-degree aggravated assault with firearm, N.J.S.A. 2C:12-1(b)(4) (counts eight, nine and ten); one count of second-degree possession of weapon for unlawful purpose – firearms, N.J.S.A. 2C:39-4(a) (count eleven); one count of second-degree unlawful possession of weapon – handgun, N.J.S.A. 2C:39-5(b) (count twelve); and one count of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b) (count thirteen). Defendant was sentenced to an aggregate twenty-eight year prison term, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2., including a seventeen-year term on count two. On appeal, he argues:

> POINT I
>
> THE COURT COMMITTED REVERSIBLE ERROR WHEN IT PERMITTED [A DETECTIVE] TO TESTIFY THAT . . . A NON-TESTIFYING WITNESS[] STATED THAT SHE OBSERVED . . . DEFENDANT SHOOTING A FIREARM.

2

A. The Court violated <u>Davis</u>[1] and . . . [d]efendant's Federal and State confrontation rights when it admitted [the non-testifying witness's] testimonial statements.

B. Assuming arguendo that the [a]ppellate [c]ourt concludes that a non-witness's testimonial statement can be admitted as a hearsay exception, the State was unable to demonstrate that the statement was an excited utterance.

POINT II

THE COURT COMMITTED REVERSIBLE ERROR BY DENYING DEFENDANT'S REQUEST FOR AN "ADVERSE INFERENCE" INSTRUCTION REGARDING THE STATE'S FAILURE TO PRODUCE POLICE OFFICER WITNESSES AND [THE NON-TESTIFYING WITNESS].

POINT III

THE STATE VIOLATED . . . DEFENDANT'S DUE PROCESS RIGHTS TO A FAIR TRIAL WHEN IT CHARACTERIZED HIS DEFENSE AS A "CONSPIRACY THEORY" AKIN TO THE CONSPRIACY THEORIES SURROUNDING JFK'S DEATH, AND THEN COMPARED . . . [DEFENDANT] TO LEE HARVEY OSWALD AND . . . [DEFENDANT'S] ATTORNEY TO A CONSPIRACY THEORY PURVEYOR.

---

[1] <u>Davis v. Washington</u>, 547 U.S. 813 (2006).

A-0508-18T2

## POINT IV

THE COURT ABUSED ITS DISCRETION BY SENTENCING . . . [DEFENDANT] TO A SEVENTEEN-YEAR TERM OF IMPRISONMENT [ON] COUNT TWO OF THE INDICTMENT.

We are unpersuaded by these arguments and affirm.

Following two encounters earlier in the day—one between defendant and Latonya Damon and another earlier in the day between defendant and Damon's brother's girlfriend, Camille Walker—Damon, Joseph Hawkins, and Damon's son were sitting in Damon's car parked in front of her house. We glean these facts from Damon's testimony. Damon saw defendant "running up" to the car from "the corner where his house" was located, pulling a mask over his face. Before she left her house and entered the car, she saw defendant standing across the street wearing the same clothes he wore during the earlier encounters. Because defendant threatened Damon earlier in the day, she drove off. She saw defendant "stand there and point" and heard gunshots, although she never saw a gun. Bullets struck the rear of the car; one struck Hawkins.

A homicide detective with the Camden County Prosecutor's Office testified at trial he was on patrol when he heard shots fired in the distance. Within minutes, at approximately 6:30 p.m., he was dispatched to the location at which Damon's car was shot on the 200 block of Rand Street. As he

4

approached Damon's house, a woman exited a residence "and was very nervous and scared and excited." She pointed "catty-corner to her residence." The detective "was trying to calm her down" and "asked her if everybody was okay and what was going on." Over defense counsel's objection "as to what she said," the detective said the woman "with her excitement was pointing at the residence and said, ['defendant] just shot. He ran that way.['] And then started to point down Bank Street towards Boyd" Street. The woman did not testify at trial.

Defendant argues the admission of the woman's statement violated his right to confront the non-testifying witness, and the State did not establish her statement was admissible as an excited utterance exception to the hearsay rule.

Before addressing defendant's Confrontation Clause argument, we reject the State's counter that defendant waived his right to challenge the admission of the statements on Confrontation Clause grounds because that issue was not raised before the trial court. Defense counsel initially interposed a hearsay objection when the detective testified that the non-testifying witness was pointing, which the trial court correctly overruled because the detective had not repeated any statement made by the non-testifying witness. When the detective later testified, "through [the non-testifying witness's] excited utterance and her reaction[,] she informed me that [defendant] just shot[,]" defense counsel

interjected, "[o]bjection, Your Honor."  The trial court sustained the objection "until proper foundation [was] laid."  Defense counsel's objection "to what she said" was made after the detective described the non-testifying witness's demeanor and explained his interaction with her, and just prior to saying what the witness said.  The court overruled the objection because it "believe[d] there [was] a sufficient foundation to bring this within the excited utterance exception to the hearsay rule."

The State relies on State v. Williams which held "[t]he right of confrontation, like other constitutional rights, may be waived by the accused."  219 N.J. 89, 98 (2014).  The Court found a defendant waived his constitutional right when he raised no objection to testimony about an autopsy report by a substitute medical examiner who had not completed the postmortem procedure, id. at 93, holding a "defendant always has the burden of raising his Confrontation Clause objection," id. at 99 (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 327 (2009)).  "It is the defendant's choice 'to assert (or forfeit by silence) his Confrontation Clause right.'"  Ibid. (quoting Melendez-Diaz, 557 U.S. at 326).

A defendant, however, need not precisely use the terms "Confrontation Clause" or "Sixth Amendment" to preserve a Confrontation Clause claim.  See

State v. Wilson, 227 N.J. 534, 543-44 (2017) (ruling a defendant's Confrontation Clause claim "was timely and adequate," where counsel objected "and 'alluded to an inability to cross-examine'" (quoting State v. Wilson, 442 N.J. Super. 224, 235 n.4 (2015))).  Considering the manner in which the admissibility of the non-testifying witness's statement was determined by the trial court, which did not conduct a N.J.R.E. 104(a) hearing outside the presence of the jury, counsel's objection "as to what she said" was sufficient to preserve defendant's right to claim a Confrontation Clause argument on appeal.  When defense counsel raised his last objection, the trial court turned to the assistant prosecutor who argued in response, "it's excited utterances."  The trial court did not ask defense counsel to reply, and, as we will later elucidate, the trial court's ruling before the jury—not at sidebar—did not explain how the statement met all three prongs of the excited utterance hearsay exception.  A constitutional discourse in the jury's presence need not have been presented in order to protect defendant's rights.  Defense counsel's open-court objection was sufficient.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution both provide that the accused in a criminal trial has the right to confront the witnesses against him.  U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10.  "[T]he Confrontation Clause of the United

A-0508-18T2

States Constitution bars the 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" State v. Slaughter, 219 N.J. 104, 116-17 (2014) (quoting Crawford v. Washington, 541 U.S. 36, 53-54 (2004)). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Davis, 547 U.S. at 822. In contrast, statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Ibid.

Defendant relies on our Supreme Court's holding in State ex rel. J.A., 195 N.J. 324 (2008), to support his argument that the non-testifying witness's statements were not made in response to an ongoing emergency because the gunman had already fled, thus ending any imminent danger. In J.A., a non-testifying witness's description of the perpetrators and the direction in which they were walking, given to an officer approximately ten minutes after the crime was committed, id. at 337, was admitted at trial as a present sense impression exception to the hearsay rule, N.J.R.E. 803(c)(1), 195 N.J. at 330-31, 337. Our

Supreme Court deemed the hearsay testimonial "[b]ecause there was no proof of the eyewitness's unavailability," id. at 351; "[t]here was no ongoing emergency—no immediate danger," id. at 348; and the questioning of the witness by the officer met the solemnity requirement for testimonial evidence, id. at 349-50.

We distinguish the forcible purse snatching from the victim in J.A. from the multiple shots fired at the fleeing victims—one of which was shot—in this case. We also find inapposite State v. Basil, 202 N.J. 570 (2010), another case cited in defendant's merits brief. There, police were holding defendant when a non-testifying witness returned to the scene and identified him to police as the man who pointed a gun at her; she also disclosed where he had secreted the weapon. Id. at 580, 586-87. Unlike the threat by the perpetrators in J.A. which ended when they walked away from the purse-snatching victim, and the threat posed by the gunman in Basil who had discarded the shotgun and was under police control, the threat posed by the still-armed shooter who ran from the scene did not end. Defendant does not contend that the victims were in a safe haven while the gunman was at large. Indeed, they fled, as did the shooter.

We recognize the United States Supreme Court's rejection of a state Supreme Court's erroneous interpretation of Davis "as deciding that 'the

9

statements made after the defendant stopped assaulting the victim and left the premises did <u>not</u> occur during an "ongoing emergency."'" <u>Michigan v. Bryant</u>, 562 U.S. 344, 363 (2011) (quoting <u>People v. Bryant</u>, 768 N.W.2d 65, 75 (Mich. 2009)). The Court emphasized that it did not decide in <u>Davis</u> whether the 911 caller's statements made after her attacker stopped his assault and left the premises were "made for the primary purpose of resolving an ongoing emergency." <u>Ibid.</u> The <u>Bryant</u> Court held the state Supreme Court's assumption "that <u>Davis</u> defined the outer bounds of 'ongoing emergency,' . . . failed to appreciate that whether an emergency exists and is ongoing is a highly context-dependent inquiry." <u>Ibid.</u> The Court recognized domestic violence cases like <u>Davis</u>

> often have a narrower zone of potential victims than cases involving threats to public safety. An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue.
>
> [<u>Ibid.</u>]

And, the <u>Bryant</u> Court found the separation of a gunman from the place of initial attack "might not have been sufficient to end the emergency." <u>Id.</u> at 364. The Court concluded the "argument that there was no ongoing emergency because

'[n]o shots were being fired,' . . . surely construes ongoing emergency too narrowly. An emergency does not last only for the time between when the assailant pulls the trigger and the bullet hits the victim." Id. at 373 (first alteration in original).

We should not lose sight that the determination of whether an ongoing emergency exists

> is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822. Rather, it focuses them on "end[ing] a threatening situation." Id. at 832. Implicit in Davis is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination.
>
> [Bryant, 562 U.S. at 361 (alterations in original).]

Like the 911 call perpended by the United States Supreme Court in Davis, the initial questioning by the detective was "not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." Davis, 547 U.S. at 827 (alterations in original). Like that 911 call, the non-testifying witness's obvious purpose was to seek help related to a gunman who had just opened fire on city streets and who was still at

11

large, thus presenting an imminent danger. Ibid. And, like the questioning during the 911 call in Davis, the purpose of the detective's query of the non-testifying witness was not to elicit evidence to be used in a later prosecution, but to ascertain the cause of her palpable alarm. Ibid. The non-testifying witness was like the "frantic" 911 caller in Davis. Ibid.

Indeed, the Bryant Court held questions more intrusive than those asked by the detective here

> were the exact type of questions necessary to allow the police to "'assess the situation, the threat to their own safety, and possible danger to the potential victim'" and to the public, Davis, 547 U.S. at 832, including to allow them to ascertain "whether they would be encountering a violent felon," [id.] at 827. In other words, they solicited the information necessary to enable them "to meet an ongoing emergency." Id. at 822.
>
> [Bryant, 562 U.S. at 376.]

The police in Bryant "responded to a call that a man had been shot." Id. at 375. "[T]hey did not know why, where, or when the shooting had occurred. Nor did they know the location of the shooter or anything else about the circumstances in which the crime occurred." Id. at 375-76. "[T]hey asked[,] 'what had happened, who had shot him, and where the shooting had occurred[.]'" Ibid. (quoting Bryant, 768 N.W.2d at 71).

Guided by the holdings in <u>Davis</u> and <u>Bryant</u>, we conclude the detective's brief questioning of the non-testifying witness and the witness's brief response was designed to address the ongoing emergency of an at-large, active shooter last seen running on the city's streets. The State met its burden of proving the non-testifying witness's statements were non-testimonial and the Confrontation Clause did not bar their admission at trial. See <u>Basil</u>, 202 N.J. at 596-97.[2]

Although non-testimonial statements are "exempted . . . from Confrontation Clause scrutiny," <u>Crawford</u>, 541 U.S. at 68, they remain limited by the rules of evidence, particularity "traditional limitations upon hearsay evidence[,]" <u>Davis</u>, 547 U.S. at 821. We thus analyze whether the trial court properly admitted the non-testifying witness's statements as excited utterances.

Defendant argues the State failed to prove that the statements conformed to the requirements for admission under N.J.R.E. 803(c)(2) which allows the admission of out-of-court statements offered for the truth of the matter asserted if the statements: "1) '[relate] to a startling event or condition;' 2) [are] 'made while the declarant was under the stress of excitement caused by the event or

---

[2] Defendant does not challenge that the non-testifying witness was unavailable. On cross-examination at trial, the detective said he did not know where she was.

condition;' and 3) [are made] 'without opportunity to deliberate or fabricate.'" State v. Branch, 182 N.J. 338, 365 (2005) (quoting N.J.R.E. 803(c)(2)).

The non-testifying witness's demeanor and the content of her disclosure to the detective show that she was reacting to a startling event, the shooting. That disclosure was made minutes after the detective heard the shots and responded to the scene, and the witness "was very nervous and scared and excited" to the point where the detective had to calm her. We, therefore, agree with the trial court that the first two prongs of the hearsay exception were established by the detective's testimony.

The trial court did not make any findings as to the third prong. Although facts that demonstrate the non-testifying witness did not have an opportunity to deliberate or fabricate may have been better flushed out at a N.J.R.E. 104 hearing, there are sufficient facts in the record to establish that prong. The Bryant Court, in likening the effect of an ongoing emergency to the focus of a person's attention to an emergency that results in an excited utterance, observed: "Statements 'relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition,' are considered reliable because the declarant, in the excitement, presumably cannot form a falsehood." 562 U.S. at 361 (quoting Fed. Rule Evid. 803(2)).

In determining whether the non-testifying witness had an opportunity to deliberate or fabricate, we consider the factors announced by our Supreme Court: "the shock effect" of the startling event on the declarant; "the time elapsed between that event and her [or his] statement"; "the continuing influence of the excitement caused by the" startling event; "the circumstances surrounding the taking of the statement[;] and whether the statement was in response to questions." Branch, 182 N.J. at 366.

As we have noted, the non-testifying witness showed obvious signs of stress during her encounter with the detective shortly after the shooting. The non-testifying witness exited her residence soon after the shooting; she had scant time to think about or fabricate her disclosure that defendant was the shooter and his direction of flight. There is no evidence she was with another person who could have provided her with false or inaccurate information. The non-testifying witness's demeanor and the short time between the event and disclosure evidence that the witness did not have time to "achieve[] some physical and emotional distance from the" shooting so as to "undermine[] the trustworthiness inherent in an admissible excited utterance." State v. Cotto, 182 N.J. 316, 329 (2005) (determining a thirty to forty-five minute delay between a robbery as the victims traveled to the police station to give statements "served

as a cooling-off period"). And, the detective's questions were aimed at disclosing the source of the non-testifying witness's agitation, not any information about the shooting or defendant. The admission of the non-testifying witness's statements was not "a clear error of judgment," or a "ruling . . . so wide of the mark that a manifest denial of justice resulted," State v. Prall, 231 N.J. 567, 580 (2018) (quoting State v. J.A.C., 210 N.J. 281, 295 (2012)), to warrant that we set it aside.

Even if the admission of those statements was error, we do not discern that it was "clearly capable of producing an unjust result," R. 2:10-2, so at to require reversal, State v. Scharf, 225 N.J. 547, 572 (2016). We note the non-testifying witness was not the victim in this case whose testimony was crucial to the State's case. The victims in this case testified and identified defendant as the shooter.

Damon testified that she knew defendant since she was a child—she "grew up with him"—and had seen him many times, including during an earlier encounter on the day of the shooting. She saw defendant standing across the street before she left her house and entered her car just prior to the shooting, wearing the same clothes he wore during their encounter earlier that day. In an area she described as brightly lit, she saw him "running up on" the car from "the

corner where his house" was located, as he pulled a mask over his face. She said she was sure of her identification of defendant's photograph, shown to her by police. When asked how she was so sure, she replied, "Because I know him." She testified she had known him since she was a child, having seen him "[a] lot[ m]ore than ten" times in her life.

Walker was also familiar with defendant having seen him on "[l]ess than ten" prior occasions stemming from a "family feud." She testified that she saw defendant standing "[o]n the corner of Rand and Bank Street" prior to the shooting, wearing the same orange shirt and black hoody he was wearing earlier that day when Walker said defendant had threatened her. She also testified she saw defendant running after the shooting.

Contradictory evidence was elicited from Damon's son who testified he had seen defendant approximately twenty minutes before the shooting in front of a liquor store when he had an altercation with Damon. Damon's son also identified defendant as the shooter, but testified when he saw defendant standing on the corner just prior to the shooting, a mask partially covered defendant's face. Notwithstanding the variance in the testimony of the State's witnesses, this is not a case where the only identification evidence was produced via hearsay. Defense counsel ably cross-examined the primary sources of the identification

17

evidence—Damon and Walker—who both knew defendant. We do not see that the hearsay statements of the non-testifying witness were clearly capable of impacting the verdict to cause an unjust result. R. 2:10-2; see also State v. Weaver, 219 N.J. 131, 154-55 (2014).

Defendant also claims the trial court erred by denying his request for an adverse-inference jury instruction regarding the State's failure to produce at trial the non-testifying witness and police officers who were at the scene of the altercation between defendant and Damon earlier on the day of the shooting.

An adverse inference instruction—commonly known as a Clawans charge—stems from the principle that the "failure of a party to produce before a trial tribunal proof which, it appears, would serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him." State v. Clawans, 38 N.J. 162, 170 (1962). The multitude of reasons for choosing not to call a witness requires a trial court to exercise caution before granting a request for a Clawans charge. State v. Velasquez, 391 N.J. Super. 291, 306-08 (App. Div. 2007). Because that inference may be impacted by the reasons a witness was not called, "the trial court may determine that the failure to call the witness raises no inference, or an

unfavorable one, and hence whether any reference in the summation or a charge is warranted." Clawans, 38 N.J. at 172.

Thus, before granting a Clawans charge request, the court must evaluate the party's reason for not calling a witness. State v. Hill, 199 N.J. 545, 562 (2009); Velasquez, 391 N.J. Super. at 308. The trial court must ensure that the situation calls for the charge, as the potential for prejudice is high where an erroneous charge is given. Hill, 199 N.J. at 562; Velasquez, 391 N.J. Super. at 312. The trial court must consider "all relevant circumstances" and make findings

> (1) that the uncalled witness is peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate relevant and critical facts in issue [;] and (4) that such testimony appears to be superior to that already utilized in respect to the fact to be proven.
>
> [Hill, 199 N.J. at 561-62 (alteration in original) (quoting State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985)).]

Through that lens, we agree with the trial court who denied defendant's request for a Clawans charge as to the non-testifying witness, finding: she was

19

not under the State's control; her whereabouts at the time of trial were unknown; and she did not have knowledge superior to the actual victims of the shooting who testified at trial. The victims in this case testified and identified defendant as the shooter. We also observe the non-testifying witness was not the victim in this case whose testimony was crucial to the State's case. Further, the detective testified that he did not know where the non-testifying witness was on the day he testified. The assistant prosecutor represented to the court that the last known address the State had for the witness—the address listed in the police reports—is an abandoned building. The trial court did not stray from the Court's required analysis in declining defendant's request for failing to give the Clawans charge as to the non-testifying witness.

Defendant avers the police witnesses were present during an altercation described by Damon during her trial testimony. Damon said defendant jumped in front of her car and yelled obscenities at her and threatened to kill her. Her brother and others who were in the car behind Damon's "jumped out on" defendant, whereupon defendant "yelled to the police officers to help him" claiming Damon's brothers were armed and "trying to shoot" defendant. The police came over, inquired about the incident and advised Damon "to go home and that [defendant] was just blowing smoke [and was] not gonna do nothing"

20

to Damon; they also told Damon to file a harassment charge against defendant after the holiday weekend.

Defendant contends the officers would have been able to testify about the altercation, specifically "who threatened whom." He argues the officers, who did not arrest defendant, were more objective—and thus superior—to witnesses called by the State,[3] and that the State "had access to tours of duty records, internal radio communications and other records pertaining to the identity of the law enforcement witnesses." He asserts "[t]he testimony by the witnesses about the altercation suggests that the officers did not arrest . . . [d]efendant because, contrary to the witnesses' claims, the police did not hear . . . [d]efendant make any threats" and the officers' instruction to "the witnesses and not . . . [d]efendant to go home supports that the witnesses instigated the altercation."

The trial court refuted defendant's contention that the police officers were within the State's control, observing there was no evidence of the officers' identities because "[t]here is no information that a report was prepared regarding that incident." We agree. We further note defendant's bald speculation about the reasoning behind the officers' actions is insufficient to warrant a <u>Clawans</u>

---

[3]  Defendant does not identify the other "witnesses" who testified about the altercation. We gather from defense counsel's summation that they were Damon and Walker.

charge. So too, defendant offers no evidence that the State could ascertain the officers' identities through technological means. Defendant points to nothing in the record to establish that he sought the officers' identities in discovery. Moreover, the evidence about the prior altercation was admitted under N.J.R.E. 404(b) to show "motive, intent or identification." The State was therefore required to limit the evidence to that necessary to establish those possible purposes. See State v. Barden, 195 N.J. 375, 390 (2008). We also note that defense counsel pointed out to the jury that despite defendant's alleged threats to Damon and Walker, the police did not arrest defendant, asking the jury, "Does that make sense? Does that add up to you?" He also highlighted that defendant called out to the police even though Damon claimed he threatened her. Considering those circumstances, the trial court did not err by refusing defendant's request for a Clawans charge vis-à-vis the officers.

We see no merit in defendant's argument that the prosecutor's misconduct during summation—comparing "[d]efendant to Lee Harvey Oswald, the assassin of President Kennedy" and by describing his "case as a conspiracy theory and . . . [d]efendant's lawyer as a purveyor of conspiracies"—deprived him of due process and a fair trial. Our review of a claim of prosecutorial misconduct

22

during summation is one of law, thus is plenary.  State v. Smith, 212 N.J. 365, 387 (2012).

"So long as he [or she] stays within the evidence and the legitimate inferences therefrom the [p]rosecutor is entitled to wide latitude in his [or her] summation."  State v. Mayberry, 52 N.J. 413, 437 (1968).  "Prosecutors are permitted to respond to arguments raised by defense counsel as long as they do not stray beyond the evidence."  State v. Morais, 359 N.J. Super. 123, 131 (App. Div. 2003).

The assistant prosecutor told the jury:

> Ladies and gentlemen, this is not some grand conspiracy.  The simplest explanation is the correct explanation.  [Defense counsel] wants you to believe that it was some other masked man, it's a bad neighborhood, that somebody else shot her because people love conspiracy theories.  Think about JFK.  Who shot him.  Well, people will say it was CIA, there was somebody on the grassy knoll.  It was a grand conspiracy.  There was more than one shooter.  That bullet took a right turn.
>
> Ladies and gentlemen, Lee Harvey Oswald shot JFK, a lone shooter.  This defendant shot . . . [Damon's] car injuring . . . Hawkins.  Simple explanation.  There's nobody on the grassy knoll.  There's no secret masked man running around Camden who happens to shoot . . . Damon's car moments after this defendant threatened them.  The simplest explanation is the correct one.  He was seen standing on the corner.  He was seen walking

23

up the street towards her car. Moments later, that gun fire rang out.

We do not countenance the invocation of a reviled assassin by an assistant prosecutor in an attempt to debunk a defendant's theory of the case, or personal attacks on defense counsel. But the assistant prosecutor was responding to defense counsel's summation in which he claimed the State's witnesses' contradictions and animosity toward defendant evidenced that they were fabricating the prior incidents and the charges, particularly in light of defendant's alibi witnesses. The intemperate reference to the Kennedy assassination and its aftermath was not as egregious as defendant's present characterization, and it certainly was not "so egregious that it deprived defendant of a fair trial," State v. Wakefield, 190 N.J. 397, 442-43 (2007), especially considering the trial court's jury instruction to "only consider such facts which in your judgment have been proven by the testimony of witnesses or from exhibits admitted into evidence by the [c]ourt. . . . Arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence." The jury is presumed to have followed that instruction. See State v. Loftin, 146 N.J. 295, 390 (1996) ("That the jury will follow the instructions given is presumed."); see also State v. Setzer, 268 N.J. Super. 553,

566 (App. Div. 1993) (holding an isolated improper comment may be insufficiently prejudicial to warrant reversal, especially where the trial court instructed the jury that counsel's statements are not evidence). The jury had full opportunity to apprise the victims' testimony and consider defendant's misidentification theory, buttressed by his three alibi witnesses. Considering "the 'fair import' of the State's summation in its entirety," State v. Jackson, 211 N.J. 394, 409 (2012) (quoting Wakefield, 190 N.J. at 457), the assistant prosecutor's comments were not sufficiently prejudicial to warrant reversal, R. 2:10-2; State v. Macon, 57 N.J. 325, 336 (1971).

Defendant contends "[t]he trial court abused its discretion by sentencing . . . [d]efendant to an extended seventeen-year term of imprisonment for [c]ount two of the [i]ndictment." Defendant's argument that the trial court double-counted his prior criminal record to find defendant was a persistent offender under N.J.S.A. 2C:44-3(a)—granting the State's motion to impose a discretionary extended term sentence—and using the prior record to find aggravating factors three (risk that defendant will commit another offense), six (extent of prior criminal record and seriousness of offenses) and nine (need for deterrence) is sufficiently without merit. N.J.S.A. 2C:44-1(a)(3), (6) and (9).

A-0508-18T2

Defendant distorts the trial court's findings. The trial court twice said it was not counting defendant's two most recent Superior Court convictions in determining the aggravating factors. Although it listed those convictions in delineating defendant's entire record—including twelve municipal court convictions, six other Superior Court convictions, a parole violation, a probation violation and Family Part contempt conviction for violating a restraining order—the court did not twice rely on the two convictions used to impose an extended term as clearly shown by the court's careful and thorough oral sentencing findings.

Defendant's contention that the trial "[c]ourt did not conduct a qualitative inquiry as to . . . [d]efendant's active participation in his children's lives and to what extent they depended on him, and the effect . . . his prolonged imprisonment would have on their development" is similarly meritless. The trial court, in rejecting mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11) (excessive hardship that imprisonment would bring to defendant or his dependents), did not "find the fact that . . . defendant has young children to put him in a different position than many defendants that come before the [c]ourt. It is not an undue burden. There's nothing unique about this situation which makes it different [from] the other situations which the [c]ourt sees."

A-0508-18T2

The trial court's finding is well supported. Defendant's presentence report indicates he: does not have custody of his three minor children; was not under court-ordered obligation to pay child support; was unemployed at the time of sentencing; had "a very limited history of gainful employment"; and had no income or assets.

"Appellate courts review sentencing determinations in accordance with a deferential standard. The reviewing court must not substitute its judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). We will affirm a sentence unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

None of those factors are here present. Under our deferential standard we see no reason to disturb the trial court's sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0508-18T2