# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1271-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ALEJANDRO
VELASQUEZMARTINEZ,

     Defendant-Appellant.

_____

Submitted December 9, 2025 – Decided May 26, 2026

Before Judges Sumners, Susswein and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 21-11-1037.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Austin J. Howard and Margaret Ruth McLane, Assistant Deputy Public Defenders, of counsel and on the briefs).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Jon F. Hernandez, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Alejandro VelasquezMartinez appeals his jury trial convictions for aggravated sexual assault and endangering the welfare of a child. The victim was eight years old. Defendant contends that his Miranda[1] rights were violated and that his statement to police should not have been admitted. He also contends his negotiated guilty plea was improperly vacated, resulting in the jury trial that led to the imposition of a thirty-four-year period of parole ineligibility—much longer than the fifteen-year parole ineligibility term contemplated in the vacated plea agreement.[2] He also challenges the sentence that was ultimately imposed, arguing it is excessive.

After reviewing the record in light of the governing legal principles, we affirm the trial convictions and sentence. We agree with defendant that a police interrogator posed a substantive question to him while defendant was in custody but before he had been read the Miranda warnings. Defendant's pre-warning admission that he was in the victim's house on the day of the assault, therefore, should have been suppressed as a per se Miranda violation. However, the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] Aggravated sexual assault of a child under the age of thirteen is subject to enhanced punishment under the Jessica Lunsford Act, N.J.S.A. 2C:14-2. Under that statute, the mandatory minimum term is twenty-five years of parole ineligibility, which can be reduced to no less that fifteen years pursuant to a plea agreement. N.J.S.A. 2C:14-2 (a), (d).

admission of his pre-warning statement was harmless beyond a reasonable doubt. The fact that defendant was in the house was undisputed; he was there doing repair work. Defendant's pre-warning admission, moreover, did not "let the cat out of the bag" as to render his ensuing waiver of rights involuntary.

We also agree with defendant that the interrogating officer did not adequately clarify an ambiguous request for an attorney during the Miranda waiver colloquy. Once again, however, the constitutional error in admitting defendant's ensuing statement was harmless beyond a reasonable doubt. Although he admitted that he played with the child, he denied the sexual assault allegations. Importantly, moreover, the State presented overwhelming evidence of guilt, including DNA saliva evidence that corroborated the eight-year-old victim's claim that defendant licked her vagina.

We also are unpersuaded by defendant's contention the judge at the initial sentencing hearing (motion judge) erred by vacating the negotiated guilty plea that had been entered by another judge. The motion judge acted within his discretion in responding to defendant's contradictory statements regarding the factual basis for the crime he had pled guilty to and his understanding of the penal consequences of the guilty plea. Nor did the judge at the second

A-1271-23

sentencing hearing (trial judge) abuse her discretion in imposing sentence following the jury verdict.

## I.

We discern the following facts and procedural history from the record.

### The Crime and Initial Investigation

The victim, S.C.,[3] was eight years old at the time of the sexual assault in August 2019. S.C.'s mother hired defendant to repair a second-floor bathroom floor that had been damaged by a leak. Defendant began working in the home in August 2019. He came and left during the day as he pleased by using the garage entrance.

On August 19, while her parents were at work, S.C. was lying in bed watching YouTube when defendant approached her. Defendant asked her to pull her pants down, which she did. Defendant then started licking her vagina.

S.C. asked to go to the bathroom to get away. She used the bathroom at the end of the hallway, then fled to the attic and tried to call her mother. Her mother did not answer, but S.C. told her about the incident later that day.

S.C. and her mother drove to the police station that evening. S.C.'s mother brought the clothes S.C. had been wearing at the time of the assault, including

---

[3] We use initials to protect the privacy of the underage victim. R. 1:38-3(c)(9).

her underwear. At the police station, they spoke on the phone with Detective Christina Ferencevych from the Special Victims Unit of the Bergen County Prosecutors Office (BCPO), who told her to return the next morning.

Ferencevych conducted a recorded interview with S.C. during which the victim stated that "the man from the bathroom" touched her vagina. She asserted that as she was lying on her parents' bed with her iPad, defendant pulled her pants down halfway and licked her private area and touched it with his fingers. Defendant told her not to tell anyone. When the interview was completed, S.C. went to the hospital for a forensic examination.

The Custodial Interrogation

Defendant was arrested later that morning and was brought to the BCPO. Detective Ferencevych and BCPO Sergeant James Harris questioned him for approximately one hour. The following colloquy occurred between Harris and defendant before defendant was read his Miranda rights:

> [Sgt. Harris:] And they told you [what] you're under arrest for?
>
> [Defendant:] No.
>
> [Sgt. Harris:] It's a [s]exual [a]ssault. Right, so what we have is this eight-year-old kid tell us what happened to her yesterday. You were working at her house yesterday, right.

5

[Defendant:] Uh-huh.

[Sgt. Harris:] So, before I can tell you anything or, or talk to you um, what I like to . . . I really, you're under arrest but I want to talk to you and hear your side. Cause we have this eight-year-old girl telling on her side[] and if we got an eight-year-old girl telling on her side. We need to . . . we kinda need to know what happened. Cause only person that, only people who know what happened is you and her. And what she's saying, she is saying, but I just need to hear your side. Are you willing to talk to us?

[Defendant:] What do you want me to say?

[Sgt. Harris:] I just want you to tell me about your day but before we talk. I just need to go over your . . . Miranda [r]ights. You okay with that? Do you want to speak to us?

[Defendant:] Of course, I mean . . . whatever.

Harris offered to provide defendant with his rights in Spanish, and he said he was "okay" with English and would let Harris know "if it gets too complicated." Harris then confirmed that he could read the English on the Miranda form. While Harris was reading defendant his Miranda rights but before defendant signed the waiver form, the following conversations took place:

[Sgt. Harris:] Okay, you may stop answering questions and request an attorney at any time.

[Defendant:] Uh-huh.

6

[Sgt. Harris:]  You know what that means?

[Defendant:]  Yeah, I mean, I don't, I mean, I can't, I am allowed to stop answering any questions, anytime—

[Sgt. Harris:]  At any time.

[Defendant:]  —I feel like it.

[Sgt. Harris:]  Okay, very good so, if you agree with everyone what we just read I need you to write yes next to it.

. . . .

[Sgt. Harris:]  So, I just wanna make that clear you are under arrest.  You are under arrest for [s]exual [a]ssault. She gave her story.  We need to hear your story.  We read you your rights, are you willing to speak to us right now?

[Defendant:]  Sure.

[Sgt. Harris:]  Okay, so I need you . . . to sign.  Print your name here and sign.

[Defendant:]  Oh God, I hope I'm doing the right thing.

[Sgt. Harris:]  Do you understand, again—

[Defendant:]  I mean I understand everything is written down—

[Sgt. Harris:]  Okay.
[Defendant:]  —in here.

[Sgt. Harris:]  Okay and you understand you can stop at any time.

A-1271-23

[Defendant:]  I understand what you're telling me yeah. But there is something I don't understand, the, what I don't understand is, okay I uh, you guys are going to ask me questions. . . . I'm gonna tell you whatever the story is or whatever you wanna hear, my side of the story I should say.  But what I don't understand, what the difference is if I wanna talk to my lawyer first—

[Sgt. Harris:]  Uh, uh, okay.

[Defendant:]—and what—

[Sgt. Harris:]  . . . I'm a stop you right now.

[Defendant:]  All right.

[Sgt. Harris:]  This is where I'm gonna stop you.  If you say attorney and you wanna speak to your attorney.

[Defendant:]  Yeah, I mean eventually I have to get one.

[Sgt. Harris:]  That's fine.

[Defendant:]  Seems like I have to get one.

[Sgt. Harris:]  Yeah, that's fine but, we wanna hear your side, right.

[Defendant:]  Okay.

[Sgt. Harris:]  And it's important that we hear your side, right.

[Defendant:]  Of course.

[Sgt. Harris:]  We read you your rights, you know you[r] rights, right.

A-1271-23

[Defendant:]  Uh-huh.

[Sgt. Harris:]  You understand these rights?

[Defendant:]  Yes, I understand.

[Sgt. Harris:]  And this is saying is I understand my rights, I can stop at any time whenever you feel uncomfortable, say let's get out of here let's go, all right.

[Defendant:]  Okay.

Defendant signed the Miranda waiver form.  During the interrogation, defendant admitted that he was working at S.C.'s house on August 19.  However, he denied touching her vagina.  Defendant stated that he asked S.C. to tie his bandana while she was playing on her tablet under the covers in her bed.  He also stated that he "playfully" shook her legs when she finished tying it.  When Harris asked defendant, "[y]ou moved her, did you move the covers?" defendant replied, "[u]h, I mean I moved them a little bit."  Defendant continued, "I mean I went, as I shake her and then I moved the covers you know."

The Entry and Subsequent Revocation of the Guilty Plea

On March 6, 2020, defendant entered a guilty plea to first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), in exchange for a sentencing recommendation of fifteen years of imprisonment without parole—the shortest sentence permitted under the Jessica Lunsford Act.

9

Pursuant to his plea, defendant was required to be evaluated by the Adult Diagnostic and Treatment Center (ADTC).  The ADTC report issued on October 30, 2020, stated in pertinent part:

> During the present examination, [defendant] said he was doing renovations in the victim's residence.  He was working in the bathroom, never opened the window and inhaled dust from concrete he had been mixing as well as fumes from glue and oil-based primers he was using. [Defendant] said "I could not breathe.  I couldn't catch my breath.  I thought I was going to crash.  The bed was right there."  [Defendant] said he collapsed on the bed the victim was occupying and said in the process of collapsing, he grabbed the victim's ankles.

According to the report, defendant then claimed he "had no memory of his actions when he was on the bed with S.C." and suggested that if he had sexually assaulted her, he was not conscious or aware at the time.

On December 4, 2020, the parties appeared before another judge (motion judge) for what was scheduled as a sentencing hearing.  The matter did not proceed, however, because defendant requested a substitution of attorney.  During this proceeding, the State voiced concern with defendant's ADTC evaluation and pre-sentence report (PSR) interview, asserting that defendant "very blatantly disavowed his plea."  The judge adjourned the matter to allow defendant time to speak with his newly retained counsel.

10

The sentencing hearing was rescheduled for February 25, 2021. Sometime before the hearing, defendant filed a motion to withdraw his guilty plea. Then, the day before the hearing, defense counsel submitted a letter withdrawing his motion to withdraw defendant's guilty plea and requesting that the matter be postponed pending a second ADTC evaluation. Defense counsel explained that, before his first ADTC evaluation, defendant was advised to "minimize what took place" and that this may have led him not to be fully open and honest with the ADTC evaluator. The State reiterated its concern that defendant's statements to the ADTC negated the factual basis for his guilty plea.

The motion judge asked defendant to give another factual basis and defendant was sworn in. The following questions were posed to defendant by defense counsel:

> [Defense Counsel:] . . . I'm going to direct your attention to August 19[,] 2019. On that day, were you working in a house in the Borough of Demarest?
>
> [Defendant:] Yes.
>
> [ Defense Counsel:] And at that time when you were working the house, was there a girl in the house who you may not have known at the time but now know to be under the age of [thirteen], with the initials of S.C.?
> [Defendant:] Yes.

[Defense Counsel:] And while you were working in that house, at some point in time, was she in a bed adjacent to a bathroom while you were working?

[Defendant:] Yes.

[Defense Counsel:] And during the course that you were working there, did you in fact go into the bedroom and at that time, performed the act of sexual penetration by performing cunnilingus upon the victim with your mouth and her vagina?

[Defendant:] Yes.

[Defense Counsel:] And did you, in fact, know that that's what you were doing at the time?

[Defendant:] Yes.

The prosecutor asked additional questions, confirming that S.C. was eight years old at the time. At the motion judge's prompting, defendant also confirmed that the fumes from the retiling project "did not prevent him from knowing what [he] [was] doing when [he] committed this act that [he] just pled guilty to" and that he committed that act "of [his] own volition."

The motion judge and the prosecutor both stated they were satisfied with the new factual basis. The judge decided to postpone sentencing for seventy-five to eighty days to allow for a second ADTC evaluation.

The second ADTC report, issued on March 17, 2021, stated in pertinent part:

It is my understanding that subsequent to this report, [defendant] was told to return for a re-evaluation because he told [the motion judge] he was not under the influence of fumes . . . when he committed the present offense which contradicted the explanation he provided during his initial psychological evaluation. [Defendant] informed me this was not accurate[,] and the re-evaluation was ordered based on the advice of his new lawyer who told [him] that if he wanted to receive sex offender treatment . . . he must be sentenced under the New Jersey Sex Offender Act which required a finding that his offending behavior was both repetitive and compulsive. [Defendant] said he was instructed by his lawyer to portray his actions against the victim . . . in a way that would meet this criteria.

At the request of defense counsel, the motion judge adjourned sentencing again. The judge stated:

I'm very concerned about the factual basis at this point and if I don't have a crystal clear, unequivocal explanation when I come back, when we come back next time, about why he says one thing and does another thing and . . . then I'm not putting this plea through. He's going to stand trial.

The rescheduled sentencing hearing took place on November 5, 2021. During questioning by counsel, defendant stated that it is now his understanding that the chemicals he was working with that day did not affect his ability to understand what he was doing at the time of the offense.

Defendant was also permitted to address the judge. Defendant read from a handwritten letter, saying:

13

This whole situation is all new to me, the language and terms are very difficult for me to understand. And[] I don't think I ever will. Therefore, when it comes down to legal services I don't know what a good representation is. My first private attorney . . . told me things like, "Even if I got acquitted from these charges I shall leave this country and go and live elsewhere. But[] don't live here."

Things like, "Not even the president of the United States of America[] can get you out of here." I also tried telling him I was being abused by my cellmate. He told me to[] "[s]hut up," made a hissing sound three or four times, closed his hand and placed it in front of my face saying he[] "[d]idn't want to hear about it." Leaving me in a really bad situation where I got abused for over four months.

. . . [My first attorney] . . . had me sign[]some paperwork with a check box mark in it saying[] "I needed the services of an interpreter[]" . . . that he was going to produce. I never got to see or talk to one.

Defendant further asserted that his questions to his first attorney were never addressed; his phone calls, emails and letters were left unanswered; and he was denied copies of important paperwork throughout the case.

The following colloquy between defendant and the motion judge ensued:

[Motion Judge:] . . . So, let's go over this. Did you see the accusation? Did you see the complaint?

[Defendant:] Yes Your Honor.

[Motion Judge:] And, you know what you're accused of, right?

14

[Defendant:]  Yes Your Honor.

[Motion Judge:]  Put the legal terms aside, you're accused of molesting a little girl, right?

[Defendant:]  Yes Your Honor.

[Motion Judge:]  You're accused of penetrating her vagina with your fingers and licking it, you understand that, right?

[Defendant:]  I understand that.

[Motion Judge:]  I am happy to give you a trial if you'd like . . . .  If you try the case and you—and the State doesn't prove it, good for you.  If you try the case and you lose do you understand it's [twenty-five] years with [twenty-five] years of parole ineligibility or worse.  Do you understand that?

[Defendant:]  Yes Your Honor.

[Motion Judge:]  That's the minimum. . . . You do understand that?

[Defendant:]  Yes.

[Motion Judge:]  Did you go over the discovery with each of your lawyers?

[Defendant:]  Pretty much Your Honor.

[Motion Judge:]  . . . Do you know that they found your DNA in the little girl's underwear?

[Defendant:]  Yes Your Honor.

15

[Motion Judge:] Okay. Is there a way to explain how that would get there? Do you think it comes from the store with your DNA in it? Of course it doesn't, right?

[Defendant:] No Your Honor.

[Motion Judge:] . . . Do you believe if you try the case they're going to prove the case against you?

[Defendant:] Yes.

[Motion Judge:] . . . So, you know what the exposure is, you know what the discovery shows, and you've made a decision with several lawyers to take a plea offer before you get indicted to reduce the exposure. Isn't that what you did?

[Defendant:] I believe so.

[Motion Judge:] Well, what do you mean you[] "[b]elieve so?"

[Defendant:] . . . I mean . . . I think so Your Honor.

[Motion Judge:] Well . . . let's test your math skills. Is [fifteen] years more or greater than [twenty-five] years?

[Defendant:] I mean, [fifteen] years is—is way better sentence than the [twenty-five] one.

[Motion Judge:] . . . Right. And certainly we are speaking in English. You speak English perfectly, correct?
[Defendant:] I learned English on my own. Yes, I do speak English Your Honor.

16 A-1271-23

[Motion Judge:] Yeah. I have no problem—discussing anything with you. Do you have any problem discussing anything with [defense counsel]?

[Defendant:] He did his best to explain everything to me Your Honor.

. . . .

[Motion Judge:] Look, we can't have wiggle room here. . . . Do you understand him or not?

[Defendant:] I—I do understand him.

[Motion Judge:] And, he understand[s] you, right?

[Defendant:] Yes.

[Motion Judge:] You communicate. You never have to stop and define terms. You communicate with each other, right?

[Defendant:] Yes.

[Motion Judge:] Okay. Am I making you say, "Yes," to anything that's not true here? Because I don't want to.

[Defendant:] No—no Your Honor. You're—

[Motion Judge:] . . . So, I have you've gone over the discovery, you know what your options are, you know you could've had a trial, you know what happens if you try the case and you lose, you know what the discovery shows, you've made a decision with more than one lawyer advising you to limit your exposure to [fifteen] years. That's what you're doing, right?

17

A-1271-23

[Defendant:] Yes.

[Motion Judge:] . . . And you did admit you did this, correct?

[Defendant:] Yes.

[Motion Judge:] Knowingly and purposely did the acts I discussed above to this little girl, correct?

[Defendant:] Correct.

The State voiced concerns, arguing that defendant when given the "opportunity to speak freely and not answer affirmative or negative to questions that are providing information to him . . . he walks back his plea or says he doesn't understand, says his [c]ounsel's been insufficient."

In a final effort to determine whether defendant understood the terms of the negotiated guilty plea, the judge asked defendant what the minimum sentence he could receive was. Defendant did not answer the question, instead responding, "I believe the child she's still whole and complete. And—and if you ask me, a first degree is a little too much. I mean—I mean a second degree would be—you know—what—you know."

The motion judge thereupon decided to vacate the guilty plea. In a written order, he explained that this was based on

> the statements made on the record today by [defendant], demonstrating that he does not understand the terms of

18

the plea agreement . . . his prior equivocation as to the factual basis supporting the plea . . . his complaint that he was not afforded an interpreter when speaking with prior counsel although he today admitted that he speaks English well and does not need an interpreter, and . . . the State's request to withdraw the plea offer based upon the conclusion of [the prosecutor] that [defendant]'s actions in disavowing his guilty plea when speaking with evaluators at [ADTC] on two separate occasions coupled with his statement made in court today prevent her from presenting reasons to deviated from the [twenty-five] year mandatory minimum specified in [N.J.S.A. 2C:14-2(a). See State v. A.T.C., 239 N.J. 450, 473-476 (2019).]

Indictment and Pretrial Motion to Admit Defendant's Recorded Statement

On November 16, 2021, defendant was charged by indictment with two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (counts one and two); one count of second-degree sexual assault, N.J.S.A. 2C:14-2(b) (count three); and one count of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (count four).

Prior to trial, the State moved to admit audio-video recorded statements of defendant. The judge who had vacated the guilty plea held an evidentiary hearing in June 2022 and oral argument in July 2022. On August 3, 2022, the motion judge issued a written order and opinion, granting the State's motions and permitting the recordings to be admitted into evidence. The judge concluded that defendant knowingly, intelligently, and voluntarily waived his rights. In

reaching that conclusion, the judge made a number of factual findings, including:

> Defendant's statement was taken beginning at 11:54 [a.m.]
>
> . . . .
>
> Defendant verbally answered "yes" to each of his rights and printed his initials next to each of his rights indicating he understood the right.
>
> After reading the waiver portion, defendant asked detectives several questions and for clarifications. Detectives addressed defendant's questions and did not begin the interview until defendant indicated he wanted to do so.
>
> . . . .
>
> The interrogation thereafter commenced, but at approximately 12:50 [p.m.] stopped, when defendant invoked his right to an attorney.

Applying the law to these facts, the judge explained:

> Turning, then, to the totality of the circumstances, the State has established, beyond a reasonable doubt, that the statements made by the defendant on August 20, 2019 were made knowingly and voluntarily. This court is so convinced because the evidence establishes that the defendant was clearly advised of his Miranda rights and clearly understood that he did not have to make any statements. He also clearly understood all of the questions which was evidenced by the fact that he responded directly to each question that was posed. He was treated courteously. The interrogation was brief,

20

and questioning stopped when defendant did invoke his right to counsel.

Furthermore, this court finds that [defendant]—cognizant of that fact th[at] he was facing sexual assault charges—sufficiently knew the gravity of the accusation and the implications waiving his rights would have, regardless of whether it was aggravated sexual assault or sexual assault. Accordingly, the statements are admissible at trial.

<u>Jury Trial and Sentence</u>

A jury trial was convened by a third judge (trial judge) and was heard over the course of four days in May 2023. The State introduced expert testimony from Mary Beth Mariano, a board-certified pediatric nurse practitioner and advanced practice nurse, about S.C.'s examination at the hospital. Mariano stated that she did not observe any external injuries on S.C.'s genital area. She testified that she collected vaginal specimens and a buccal swab from S.C. The specimens were for the forensic evidence collection kit, while the buccal swab was to check for S.C.'s own DNA. Once collected, the specimens and buccal swab were provided to the BCPO.

Allison Lane, a forensic scientist with the New Jersey State Police Office of Forensic Sciences, testified that amylase was found in the crotch area inside S.C.'s underwear. She explained that amylase is a substance that is found in high concentrations in saliva.

21

Laura Cannon, a forensic DNA expert who also worked for the New Jersey State Police Office of Forensics Sciences, testified that she conducted various tests on the samples provided to the lab, including two samples from S.C.'s underwear. One sample from the underwear "did not have sufficient quantity or quality to make any determinations about that DNA." However, the second sample from S.C.'s underwear did. The DNA profile on it was consistent with S.C.'s. Furthermore, when Cannon conducted a Y-STR DNA analysis[4] of the item, the Y-STR DNA profile obtained from the underwear matched defendant's Y-STR DNA profile. Due to the nature of Y-STR analysis, Cannon testified that "all [of defendant's] paternal male relatives cannot be excluded as possible contributors to the Y[-]STR DNA profile obtained" and that there was at a 1 in 2,000 probability that other individuals in the population could have the same profile.

The jury found defendant guilty on all counts. On September 9, 2024, the trial judge sentenced defendant to an aggregate term of forty years of imprisonment with a thirty-four-year period of parole ineligibility.

---

[4] Cannon explained that Y-STR analysis is a "Y chromosome test" that is "specific to males" and generates a DNA profile from an item of evidence.

A-1271-23

This appeal follows. Defendant raises the following contentions for our consideration:

POINT I

REVERSAL IS REQUIRED BECAUSE THE INTERROGATING DETECTIVES COERCED DEFENDANT'S MIRANDA WAIVER AND STATEMENT AND IGNORED MULTIPLE INVOCATIONS OF HIS RIGHTS.

    A. Defendant's Statement and Motion Court's Decision.

    B. The Detectives Unlawfully Questioned Defendant Before Advising Him of His Miranda Rights.

    C. The Detectives Ignored Multiple Invocations of Defendant's Rights.

    D. The Detectives Unlawfully Coerced Defendant's Miranda Waiver.

    E. The Detectives Repeatedly Minimized and Contradicted the Miranda Warnings and Coerced Defendant's Entire Statement.

    F. The Detectives' Flagrant Miranda Violations Were Not Harmless.

POINT II

THE ORIGINAL SENTENCING JUDGE ERRED BY REJECTING DEFENDANT'S PLEA WITHOUT APPLYING THE PROPER LEGAL STANDARD OR PERMITTING A BRIEF ADJOURNMENT.

23

POINT III

DEFENDANT'S 40-YEAR SENTENCE—NEARLY
THREE TIMES HIS NEGOTIATED PLEA—IS AN
EXCESSIVE TRIAL TAX.

Defendant raises the following contentions in his reply brief:

POINT I

REVERSAL IS REQUIRED BECAUSE THE
INTERROGATING DETECTIVES COERCED
DEFENDANT'S MIRANDA WAIVER AND
STATEMENT AND IGNORED MULTIPLE
INVOCATIONS OF HIS RIGHTS.

POINT II

THE ORIGINAL SENTENCING JUDGE ERRED BY
REJECTING DEFENDANT'S PLEA WITHOUT
APPLYING THE PROPER LEGAL STANDARD OR
PERMITTING A BRIEF ADJOURNMENT.

II.

MIRANDA-RELATED CONTENTIONS

A.

General Self-Incrimination Principles

We first address defendant's contentions regarding the admission of his

stationhouse statement to police. We begin our analysis by acknowledging the

general legal principles that govern the various Miranda-related issues raised in

this appeal.

The right against self-incrimination is "[o]ne of the most fundamental rights protected by both the Federal Constitution and state law." State v. O'Neill, 193 N.J. 148, 167 (2007). It is well-settled that "[c]onfessions obtained by the police during a custodial interrogation are barred from evidence unless the defendant has been advised of [their] constitutional rights." State v. Knight, 183 N.J. 449, 461 (2005). A waiver of the constitutional right against self-incrimination must be knowing, intelligent, and voluntary. Ibid. (citing Miranda, 384 U.S. at 444).

"Miranda and its progeny, it bears noting, establish a per se rule in the sense that the failure by police interrogators to deliver any of the required warnings/advisements automatically results in the suppression of an ensuing statement." State v. Diaz, 470 N.J. Super. 495, 517 (App. Div. 2022) (citing State v. Carty, 170 N.J. 632, 649 (2002)). However, police are not required to administer Miranda warnings before asking a defendant for "routine pedigree information, including [their] name and address, for purposes of completing [an] arrest report." State v. Melendez, 454 N.J. Super. 445, 457 (App. Div. 2018). Considered "ministerial in nature and beyond the right to remain silent," pedigree information falls outside the scope of Miranda. State v. M.L., 253 N.J.

Super. 13, 21 (App. Div. 1991). Questions about the offense under investigation, however, do not fall under the pedigree information exception.

In State v. Bullock, our Supreme Court explained that a "question-first, warn-later" interrogation, sometimes also called a "two-step" interrogation, is one where police elicit incriminating statements from a defendant before administering Miranda warnings. 253 N.J. 512, 535 (2023). That practice is fraught with legal peril. The Court in Bullock reaffirmed that "[a] natural concern in those circumstances is that after an accused has once let the cat out of the bag by confessing, no matter what the inducement, [the accused] is never thereafter free of the psychological and practical disadvantages of having confessed." Ibid. (quoting State v. Carrion, 249 N.J. 253, 275-76 (2021)) (internal quotation marks and citation omitted). See also Carrion, 249 N.J. at 275-76 (noting that this psychological pressure may affect the voluntariness of a subsequent waiver (citing O'Neill, 193 N.J. at 180-81)).

"[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." State v. Hubbard, 222 N.J. 249, 267 (2015) (quoting Rhode Island v. Innis, 446 U.S.

291, 301 (1980)); see also State v. Tiwana, 256 N.J. 33, 46 (2023). The United States Supreme Court in Innis stressed that Miranda applies whenever a suspect is in police custody and "is subjected to either express questioning or its functional equivalent." 446 U.S. at 300-01.

In Edwards v. Arizona, the United States Supreme Court held that once a request for counsel has been made, an interrogation may not continue until either counsel is made available or the suspect initiates further communication sufficient to waive the right to counsel. 451 U.S. 477, 484-85 (1981). The Edwards Court added that the prosecution cannot establish a valid waiver of the right to counsel "by showing only that [the accused] responded to further police-initiated custodial interrogation even if [they have] been advised of [their] rights." Id. at 484. Additionally, "officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with [their] attorney." Minnick v. Mississippi, 498 U.S. 146, 153 (1990).

Our Supreme Court in State v. Rivas explained, "Edwards set forth a 'bright-line rule' that all questioning must cease after an accused requests counsel." 251 N.J. 132, 155 (2022) (quoting Smith v. Illinois, 469 U.S. 91, 98 (1984)). When law enforcement officers "violate the dictates of Edwards," a court must suppress even "'trustworthy and highly probative evidence,'" such as

27

a "'confession [that] might be voluntary under traditional Fifth Amendment analysis.'" Ibid. (alteration in original) (quoting Arizona v. Roberson, 486 U.S. 675, 681-82 (1988)) (additional internal quotation marks and citation omitted). "In other words, if law enforcement officers 'initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver' of [their] rights." Ibid. (quoting McNeil v. Wisconsin, 501 U.S. 171, 177 (1991)).

Not every reference to a lawyer automatically requires a halt to questioning. State v. Dorff, 468 N.J. Super. 633, 647 (App. Div. 2021). Reviewing courts must determine "on a case-by-case basis whether the mention of counsel constitutes an invocation of the right to counsel." Ibid. In making that determination, reviewing courts consider the totality of the circumstances, "including all of the suspect's words and conduct." State v. Diaz-Bridges, 208 N.J. 544, 569 (2012), overruled on other grounds by State v. S.S., 229 N.J. 360, 364 (2017).

It bears emphasis that the standard for enforcing Miranda rights and reviewing the validity of a waiver is especially strict under New Jersey law, which provides criminal suspects greater protections than are afforded under the

United States Constitution.  In State v. Erazo, our Supreme Court reaffirmed that "[w]ith respect to the trial court's admission of police-obtained statements . . . an appellate court 'should engage in a searching and critical review of the record to ensure protection of a defendant's constitutional rights.'"  254 N.J. 277, 297 (2023) (citation omitted) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)) (internal quotation marks omitted).

For example, in State v. Alston, 204 N.J. 614 (2011), our Supreme Court surveyed the relevant precedents and provided instruction on how to interpret an interrogee's reference to counsel.  The Court acknowledged it has followed a "different approach" than the United States Supreme Court when determining whether a request for counsel has been made, citing its decision in State v. Reed, 133 N.J. 237 (1993), which held that "a suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger entitlement to counsel."  204 N.J. at 621-22 (quoting Reed, 133 N.J. at 253).  The Alston Court further emphasized that "if the words amount to even an ambiguous request for counsel, the questioning must cease, although clarification is permitted; if the statements are so ambiguous that they cannot be understood to be the assertion of a right, clarification is not only permitted but needed."  Id. at 624.  See also Rivas, 251 N.J. at 154 (reaffirming

29

these principles).  Importantly, the <u>Alston</u> Court stressed that "because the right to counsel is fundamental, courts interpret equivocal requests for counsel in the light most favorable to the defendant."  <u>Alston</u>, 204 N.J. at 621 (quoting <u>State v. McCloskey</u>, 90 N.J. 18, 26 n.1 (1982)).

New Jersey law is also stricter than federal law with respect to the State's ultimate burden of proof.  Importantly, our law requires the State to prove a valid waiver beyond a reasonable doubt.  <u>State v. O.D.A.-C.</u>, 250 N.J. 408, 420 (2022).  Federal law, in contrast, requires proof the waiver was valid by the much lower preponderance-of-the-evidence standard.  <u>Ibid.</u> (quoting <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986)).

Aside from the constitutional right against self-incrimination, "[d]ue process also requires that the State 'prove beyond a reasonable doubt that a defendant's [statement] was voluntary and was not made because the defendant's will be overborne.'"  <u>State v. L.H.</u>, 239 N.J. 22, 42 (2019) (quoting <u>Knight</u>, 183 N.J. at 462).  This requires courts to assess the "totality of all the surrounding circumstances—[taking] both the characteristics of the accused and the details of the interrogation" into consideration.  <u>Dickerson v. United States</u>, 530 U.S. 428, 434 (2000) (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)).

Moreover, the State cannot shoulder its heavy burden when police "repeatedly contradict[] and minimize[] the significance of the Miranda warnings." O.D.A.-C., 250 N.J. at 413. 423 (2022) (holding that the detective's remark that giving a statement "is only going to help you, it's not going to hurt you" contradicted and minimized the significance of the Miranda warnings). The Court emphasized that "[c]omments that contradict and hollow out Miranda warnings can negate their effectiveness and cast doubt on whether a defendant fully understood and knowingly waived [their] rights." Id. at 423.

While the rights against self-incrimination and to due process are strictly enforced under New Jersey law—more so than under federal law—the suppression of a defendant's statement, even if mandatory and automatic, does not always require a reversal of their conviction. It is well-settled that "'most constitutional errors can be harmless,' and are therefore not subject to automatic reversal." State v. Camacho, 218 N.J. 533, 547 (2014) (quoting Arizona v. Fulminante, 499 U.S. 279, 306 (1991)). See also State v. Carlton, 262 N.J. 629, 642 (2026) ("Federal constitutional errors are generally subject to harmless error review."). When a constitutional right is implicated, the harmless error analysis requires that the error be harmless beyond a reasonable doubt. See State v. Slaughter, 219 N.J. 104, 118-19 (2014) ("[W]here the trial court commits a

constitutional error, that error is to be considered 'a fatal error, mandating a new trial, unless we are able to declare a belief that it was harmless beyond a reasonable doubt.'" (quoting State v. Cabbell, 207 N.J. 311, 338 (2011))).

In State v. Tillery, our Supreme Court noted that whether the defendant's Miranda waiver was voluntary presented a "close question," but ultimately concluded that any error in the trial court's admission of the statement was harmless beyond a reasonable doubt. 238 N.J. 293, 302 (2019). The Court explained that the statement was harmless because it was not capable of changing the outcome of the defendant's trial, considering the overwhelming evidence of his guilt and that the admitted statement "contained little—if any—incriminating evidence." Id. at 319-22.

Conversely, the Court in State v. Wade concluded that case was not "an instance of overwhelming, direct evidence." 252 N.J. 209, 221 (2022). Rather, "[the] [d]efendant's statements identifying himself in the liquor store footage strengthened the State's theory of the case and the circumstantial evidence supporting it." Ibid. Noting that "the State's theory hinge[d] on circumstantial evidence of [the] defendant's location at a particular time," the Court concluded that the defendant's "self-identifying, self-inculpatory statement that color[ed] the defendant as a liar [wa]s not harmless beyond a reasonable doubt." Ibid.

Finally, we note the parties dispute whether we should apply the "plain error" or "harmless error" doctrines with respect to defendant's <u>Miranda</u>-related contentions. In this case, defendant never filed a motion to suppress, and some of the specific contentions he now raises on appeal were not broached to the judge who ruled on the State's motion to admit the statement.

We think the dispute over which error doctrine applies is largely academic when viewed in the context of the constitutional errors asserted in this appeal. As a general proposition, an <u>un</u>challenged error—that is, one not raised at the time of trial—constitutes "plain" error only if it was "clearly capable of producing an unjust result." <u>R.</u> 2:10-2. The "harmless" error rule, rather than the "plain" error variant, is used when a specified error <u>was</u> brought to the trial judge's attention. <u>State v. G.E.P.</u>, 243 N.J. 362, 389 (2020); <u>State v. Mohammed</u>, 226 N.J. 71, 86 (2016). When applying the harmless error standard, we must determine "whether in all [of] the circumstances there [is] a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits." <u>G.E.P.</u>, 243 N.J. at 389 (second alteration in original) (quoting <u>Mohammed</u>, 226 N.J. at 86-87). "In such cases, the reviewing court asks whether the error is 'clearly capable of producing an unjust result.'" <u>Mohammed</u>, 226 N.J. at 87 (quoting <u>R.</u> 2:10-2).

Both tests, then, ultimately turn on whether the error is "clearly capable of producing an unjust result."[5] And because this is a criminal case and involves asserted constitutional errors, we must view the parties' harmless error arguments through the lens of the proof-beyond-a-reasonable-doubt standard, whether or not raised as "plain" error. See Slaughter, 219 N.J. at 118-19 ("[W]here the trial court commits a constitutional error, that error is to be considered 'a fatal error, mandating a new trial, unless we are able to declare a belief that it was harmless beyond a reasonable doubt.'" (quoting Cabbell, 207 N.J. at 338)). See also State v. Butler,__ N.J. __, __ (2026) (slip op. at 19-20) (explaining that reversal is warranted under the plain error standard where "an error [is] sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached" and describing harmless error analysis as "whether the error was sufficient to raise a reasonable doubt as

---

[5]   We note this is not a case where a defense lawyer's contemporaneous perception at the time of trial is a relevant consideration in applying the harmless error doctrine. Cf. State v. Nelson, 173 N.J. 417, 471 (2002) (holding that failure to object to live trial testimony permits an inference that any error in admitting the testimony was not prejudicial); State v. Frost, 158 N.J. 76, 84 (1999) ("The failure to object [during trial] suggests that defense counsel did not believe the [witness's live trial] remarks were prejudicial at the time they were made."). We add that the plain error rule is distinguished from the harmless error rule because the failure to object when an error is committed at trial "deprives the court of an opportunity to take curative action." Frost, 158 N.J. at 84. That distinction does not apply here.

to whether the jury would have reached a different conclusion absent the error.")

(emphasis added) (internal citations omitted). In sum, we see no practical

difference between plain error and harmless error as applied to the particular

Miranda-related errors defendant asserts in this case.

B.

Pre-Warning Admission

We next apply the foregoing general principles to the present facts. We

first address defendant's contention that police violated his self-incrimination

and due process rights by eliciting an inculpatory admission from him while he

was in custody but before he was given the Miranda warnings. He contends not

only that his one-word pre-warning statement must be suppressed, but also that

this police error tainted his ensuing waiver of Miranda rights, rendering his post-

warning statement inadmissible as well.

Because it all happened so quickly, we deem it appropriate to recount

verbatim the specific portion of the pre-warning conversation at issue:

> [Sgt. Harris:]  And they told you [what] you're under
> arrest for?
>
> [Defendant:]  No.
>
> [Sgt. Harris:]  It's a [s]exual [a]ssault.  Right, so what
> we have is this eight-year-old kid tell us what happened

to her yesterday. <u>You were working at her house yesterday, right.</u>

[Defendant:] <u>Uh-huh.</u>

[(Emphasis added).]

The State argues that Harris's question—"you were working at her house yesterday, right"—was not designed to elicit an incriminating response and thus need not have been prefaced with the <u>Miranda</u> warnings. We disagree. As we have noted, the United States Supreme Court in <u>Innis</u> stressed that <u>Miranda</u> applies whenever a suspect is in police custody and "is subjected to <u>either</u> express questioning or its functional equivalent," which may include "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. 291, 300-01 (1980) (emphasis added).

Here, the officer posed a question—"[y]ou were working at her house yesterday, right"—prompting defendant to respond, "uh-huh" (yes), thereby admitting that he had been working at the victim's house on the day of the alleged sexual assault. We hold that when a question is propounded to a person in custody that pertains to the crime or to the criminal investigation, and not solely to pedigree information, that question constitutes "express questioning" under <u>Innis</u>. That is so regardless of whether the officer knew or should have

36

known the question was likely to elicit an incriminating response. Cf. State in Interest of M.P., 476 N.J. Super. 242, 297 (App. Div. 2023) (noting that in gauging the effect of a detective's remark on a suspect's understanding of their Miranda rights, the detective's subjective intent is irrelevant, and "[w]hat matters is what [the detective said] and the impact [their] . . . remark had on [the suspect's] understanding").

We add that this is not a situation where defendant made an unsolicited, spontaneous statement, sometimes referred to as a "blurt," in response to a question pertaining to pedigree information. Cf. Tiwana, 256 N.J. at 46 (holding that "unsolicited, spontaneous" statements "are not protected by Miranda when those statements are not made in response to questioning or its functional equivalent"). See also State v. Mallozzi, 246 N.J. Super. 509, 516-17 (App. Div. 1991) (holding that merely informing the defendant of the charges against him during the booking process did not constitute the functional equivalent of interrogation).

In M.L., we explained that "[e]ven unexpected incriminating statements made by in-custody defendants in response to non-investigative questions by the police without prior Miranda warnings are admissible." 253 N.J. Super. at 21 (emphasis added). Here, the question—"[y]ou were working at her house

A-1271-23

yesterday, right"—was not a "non-investigative" question within the meaning of the pedigree-question exception. We thus conclude that Harris's question was a per se <u>Miranda</u> violation rendering defendant's response inadmissible as a matter of law.

However, that conclusion does not end our analysis, because we must still determine whether the improper admission of defendant's "uh-huh" response requires us to reverse his trial conviction. As we have noted, the harmless error doctrine applies even in the face of a per se <u>Miranda</u> violation that categorically requires suppression, provided the State carries its heavy burden of proving that the admission was harmless beyond a reasonable doubt.

In this instance, the State has met that burden. Here, as in <u>Tillery</u>, defendant's "uh-huh" response was not capable of changing the outcome of his trial considering the overwhelming evidence of defendant's guilt and that the admitted statement did not speak directly to his guilt. 238 N.J. at 319-23. More specifically, defendant's answer to Harris's pre-warning question "contained little—if any—incriminating evidence," <u>id.</u> at 321, because it was not disputed that defendant had lawful access to the house and was working there on the day before the custodial interrogation. It bears emphasis that this prosecution does not hinge on the identification of the culprit but rather on whether the victim

was credible in her account of the sexual incident. Furthermore, as in Tillery, the State presented overwhelming evidence of guilt in the form of forensic DNA evidence of defendant's saliva found inside the victim's underwear, corroborating her claim that defendant licked her vagina.

C.

Impact of Pre-Warning Admission on Ensuing Waiver of Rights

We next consider defendant's follow-up contention that his post-warning statements must be suppressed because Harris's "question-first, warn-later" interrogation tactic "rendered illusory" his later waiver under O'Neill, 193 N.J. at 154-55. Under this theory, we must determine if the ensuing waiver of rights and post-waiver statement were essentially fruits of the unlawfully induced pre-warning statement. As we have noted, in Bullock, our Supreme Court acknowledged that "[a] natural concern in those circumstances is that after an accused has once let the cat out of the bag by confessing, no matter what the inducement, [the accused] is never thereafter free of the psychological and practical disadvantages of having confessed." 253 N.J. at 535 (quoting Carrion, 249 N.J. at 275-76) (internal quotation marks and citation omitted). See also Carrion, 249 N.J. at 275-76 (noting that this psychological pressure may affect the voluntariness of a subsequent waiver (citing O'Neill, 193 N.J. at 180-81)).

Relying on our Supreme Court's analysis in O'Neill, 193 N.J. at 180-81, defendant argues:

> First, the detectives did not obtain mere background information; they deliberate[ly] extracted a central admission about his whereabouts in relation to his accuser in a custodial setting that obviously called for Miranda warnings, and that admission served as the starting premise for the entire rest of the interrogation. Second, the subsequent warnings were nearly instantaneous. Third, the same detectives propounded both sets of questions. Fourth, and most importantly, they did not clarify that his pre-warning admission could not be used against him. And fifth, the post-warning questioning was plainly a continuation of the same interrogation.

Once again applying the demanding proof-beyond-a-reasonable-doubt standard, we are unpersuaded by defendant's arguments that his ensuing waiver of rights was involuntary because he had already admitted that he was in the house on the day of the incident. We reiterate that defendant did not confess in response to the pre-warning question, but only acknowledged a fact that was not disputed, and indeed, indisputable—that is, that he was working in the house the day before to re-tile the bathroom floor. This is not a situation, in other words, where defendant's pre-warning admission "let the cat out of the bag" within the meaning of Bullock's cautionary reasoning. 253 N.J. at 535. At bottom, we are satisfied beyond a reasonable doubt that defendant's pre-warning admission did

40

not create psychological pressure that rendered involuntary his post-warning waiver of constitutional rights.

D.

<u>Ambiguous Assertion of Right to Counsel</u>

We turn next to defendant's contention that substantive questioning should never have begun because he invoked his right to counsel, at least ambiguously, prior to signing the waiver form. We focus on two specific remarks defendant made in the span of a few seconds that he now claims constitute ambiguous assertions of the right to confer with counsel: (1) "But what I don't understand, what the difference is if I wanna talk to my lawyer first" and (2) "I mean eventually I have to get one. . . . Seems like I have to get one."

Defendant's first reference to counsel is essentially a request for legal advice and an explanation of his rights, not a request for an attorney. Cf. Alston, 204 N.J. at 625 (holding that the defendant's statement "should I not have a lawyer" was, "in actuality, not an assertion of a right, ambiguous or otherwise. Rather, it was a question, posed to the investigating officer, that amounted to defendant's request for advice about what the detective thought that defendant should do.").

41

The second reference to a lawyer is more problematic.  We addressed a similar statement in State v. Dorff, 468 N.J. Super. 633 (App. Div. 2021).  In that case, the defendant stated, "That's why I feel I might need a lawyer."  Id. at 649.  Construing that remark in the light most favorable to defendant, as required by Alston, 204 N.J. at 621, we concluded that defendant's statement was an invocation of her right to counsel.  Dorff, 468 N.J. Super. at 649-50.

We are unpersuaded by the State's argument that in the matter before us, defendant was referring only to the eventual need to have a lawyer and that this was not an assertion of his present need for a lawyer.  We interpret defendant's declaration—"I mean eventually I have to get one. . . . Seems like I have to get one"—as substantially similar to the statement we deemed to be an ambiguous invocation in Dorff—"[t]hat's why I feel I might need a lawyer."  Id. at 649-50.  We reiterate that under New Jersey law, unlike its federal counterpart, the invocation need not be clear, and we must interpret the language used by defendant in the light most favorable to him.  Alston, 204 N.J. at 620-22.

In response to defendant's ambiguous request, the officer was obligated to clarify the ambiguity.  He did not.  Instead, the officer responded, "Yeah, that's fine, but we wanna hear your side, right. . . . And it's important that we hear your

42

side, right." We thus conclude that everything that defendant subsequently told police must be suppressed.

Once again, that conclusion does not end our analysis because we must still determine whether statements defendant made throughout the hour-long stationhouse interrogation that was played to the jury contributed to his conviction[6] or whether the admission of those statements was harmless error.

In his post-warning statement, defendant did more than admit he was in the house. He admitted to direct interaction with the victim and that he played with her. However, he denied any sexual contact, and we reiterate that the State presented overwhelming evidence of guilt in the form of forensic DNA evidence of defendant's saliva found inside the victim's underwear. As in Tillery, this evidence of guilt was "independent of any admission by defendant in his

---

[6] Because we hold that defendant's entire interrogation statement should have been suppressed based on the per se violation regarding the right to confer with an attorney, we need not address defendant's contention that the police repeatedly ignored his requests to stop the interrogation. It is not disputed that the jury was not shown the recording of the interrogation after those invocations. Defendant acknowledges that "[o]rdinarily, those invocations would require suppression of any subsequent statements, but here, playback of the interrogation at trial ended prior to the five invocations of silence."

Nor do we need to consider defendant's contention that his statement to police was involuntary applying the totality-of-the-circumstances test, since the remedy upon such a finding would be suppression—the same remedy we have already applied to the entirety of the stationhouse interrogation based upon the per se violation of his right to confer with an attorney.

statement to police." 238 N.J. at 321. We thus conclude that the admission of defendant's post-warning statement was not capable of changing the outcome of defendant's trial and thus was harmless beyond a reasonable doubt.

III.

DECISION TO VACATE NEGOTIATED GUILTY PLEA

We turn next to defendant's contention that the motion judge improperly vacated his guilty plea, depriving him of the negotiated sentence reduction authorized under the Jessica Lunsford Act. Defendant argues that if we do not reverse his trial convictions based on the Miranda/self-incrimination issues, we must reinstate his guilty plea as an exercise of original jurisdiction or, in the alternative, we must "remand to permit defense counsel and the sentencing court to clarify any legal misapprehensions and for the court to properly evaluate [defendant]'s understanding of the plea." Defendant further argues that the motion judge's decision to vacate the plea agreement was "rash and unsupported," constituting an abuse of discretion.

The scope of our review of a decision to reject a negotiated guilty plea is limited. "In appellate review of judicial rejection of proffered plea agreements, the appropriate standard to be applied must be that of erroneous exercise of judicial discretion." State v. Daniels, 276 N.J. Super. 483, 487 (App. Div. 1994).

In <u>Daniels</u>, we explained that <u>Rule</u> 3:9-2 provides that "[t]he [c]ourt, in its discretion, may refuse to accept a plea of guilty." <u>Ibid.</u> (quoting <u>R.</u> 3:9-2). We emphasized that even where the court has given a preliminary indication of willingness to accept a plea agreement under <u>Rule</u> 3:9-3, it is clear that:

> If at the time of sentencing the court determines that the interests of justice would not be served by effectuating the agreement reached by the prosecutor and defense counsel or by imposing sentence in accordance with the court's previous indications of sentence, the court may vacate the plea or the defendant shall be permitted to withdraw the plea.
>
> [<u>Ibid.</u> (quoting <u>R.</u> 3:9-3(e)).]

Applying these principles to the present matter, we find no abuse of the motion judge's discretion. The record belies defendant's contention that the motion judge made a "rash" decision to vacate the guilty plea. On the contrary, the judge undertook a patient and sustained inquiry into whether defendant provided an adequate factual basis and understood the ramifications of his guilty plea.

We are also unpersuaded by defendant's contention that the judge improperly relied on hearsay and unsworn statements. The rules of evidence may be relaxed at sentencing hearings, <u>State v. Smith</u>, 262 N.J. Super. 487, 530 (App. Div. 1993), and the judge considered both defendant's sworn testimony

45

and the records concerning statements he made to ADTC evaluators. In sum, we see no basis to second-guess the motion judge's decision to vacate the guilty plea.

IV.

SENTENCING CONTENTIONS

Finally, we address defendant's sentencing contentions. The trial judge sentenced defendant to forty years of imprisonment with an eighty-five percent period of parole ineligibility on each of the two first-degree aggravated sexual assault counts (counts one and two), to be run concurrently. The judge merged count three (second-degree sexual assault) with the aggravated sexual assault counts. The judge sentenced defendant to five years on count four (endangering the welfare of a child), to be served concurrently with counts one and two.

The judge explained that she considered the PSR; the ADTC evaluation report from August 29, 2023, and the two prior ADTC reports; the State's sentencing memo; both parties' arguments; the victim impact statement by the victim's mother; defendant's statement; and the letters sent from friends and family on defendant's behalf.

The judge found that defendant took no responsibility for his actions. Rather, defendant claimed he merely asked an eight-year-old girl to help tie his

bandana. The judge further noted that while defendant claimed to be remorseful, he was not sincere and essentially blamed his attorney for his conviction.

In applying the statutory sentencing factors, the judge found aggravating factor one, the nature and circumstances of the offense. N.J.S.A. 2C:44-1(a)(1). The judge explained:

> . . . [I]nitially this [c]ourt was not going to find aggravating factor one so as not to double count because the nature . . . of the crime and the age of the victim were already contemplated by the statute in making it a first degree crime, however I think it is significant.
>
> I am persuaded by the State that the fact that this occurred in the victim's home in her parent's bedroom in her parent's bed is absolutely an aggravating factor and it's interesting that [defendant] points out the most precious thing in the world is a home and yet he violates the sanctity of th[e] victim's home by violating the victim in that home in her parent's bedroom in her parent's bed. So I do give moderate weight to aggravating factor one.

We are satisfied the judge's application of aggravating factor one based in part on the location of the crime in S.C.'s home is supported by the facts in the record. Defendant's actions occurred in a place that heightened the harm to S.C. and thus is a legitimate circumstance to consider in the sentencing equation. This is not a case of double counting the elements of the offense.

47

The judge also found aggravating factor two—the gravity and seriousness of harm inflicted on the victim, N.J.S.A. 2C:44-1(a)(2)—because of the psychological trauma suffered by S.C. The judge cited the State's expert trial witness who opined that the crime required S.C. to undergo repeated counseling and examinations. The judge gave this factor "heavy weight."

The judge additionally found aggravating factor three, the risk that the defendant will commit another offense. N.J.S.A. 2C:44-1(a)(3). In support of this factor, the judge cited defendant's statements during his prior ADTC evaluation, his failure to accept responsibility for his actions, and the contents of defendant's August 19, 2019, statement to law enforcement—which the ADTC evaluator found were unsupported, self-serving statements. The judge specifically noted defendant's contradictory statements that he was under the influence of chemical fumes and does not recall anything but also was able to provide a story of "playfully" shaking S.C.'s legs to police. The judge further explained that the letter defendant sent to S.C.'s mother "failed to express any shred of remorse and instead used that opportunity to complain to the victim's mother [about] his trials and tribulations while incarcerated."

Furthermore, the judge found aggravating factor nine, the need for deterrence, N.J.S.A. 2C:44-1(a)(9), based on the strong need to deter defendant, as well as others, from committing sexual assaults against young children.

With respect to mitigating factors, the judge found factor seven—that the defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense, N.J.S.A. 2C:44-1(b)(7). The judge nonetheless gave this factor "minimal weight," explaining she was concerned by the initial ADTC report, which included defendant's admissions to engaging in incest and bestiality and being aroused by girls as young as fourteen years old. The report also indicated that he harbors "cognitive distortions" regarding sexual assault of children and that he "deliberately hurt a woman while they were having sex" because "sometimes [he] think[s] they deserve it."

In balancing the statutory factors, the trial court found that the aggravating factors "clearly and convincingly and substantially outweigh the mitigating factors which militate towards a significant state prison sentence."

The scope of our review is limited. "Appellate courts review sentencing determinations in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). The reviewing court must not substitute its judgment for

A-1271-23

that of the sentencing court. State v. O'Donnell, 117 N.J. 210, 215 (1989).

Accordingly, a sentence must be affirmed unless:

> (1) [T]he sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Stated another way, we may modify a defendant's sentence only when convinced that the sentencing judge was clearly mistaken. State v. Johnson, 118 N.J. 10, 15 (1990); State v. Jabbour, 118 N.J. 1, 6 (1990).

Applying these foundational principles, we find no abuse of discretion with respect to the application and weighing of the relevant statutory factors. See O'Donnell, 117 N.J. at 216 ("[A]n appellate court should not second-guess a trial court's finding of sufficient facts to support an aggravating or mitigating factor if that finding is supported by substantial evidence in the record."). We add there is no evidence to support defendant's assertion that the judge punished him for maintaining his innocence. See State v. Carey, 168 N.J. 413, 427 (2001) (affirming sentencing court's finding that the defendant's denial of responsibility indicated he was more likely to reoffend).

Nor are we persuaded by defendant's argument that the court should have found mitigating factor four—substantial grounds tending to excuse or justify the offense, N.J.S.A. 2C:44-1(b)(4)—based on defendant's history of suffering from abuse as a child. Defense counsel did not argue that factor at the sentencing hearing. Furthermore, defendant does not provide a record or expert opinion that supports the conclusion that this mitigating factor applied. While the PSR and ADTC report cited in defendant's appeal brief acknowledge instances of childhood abuse, neither report concludes that those childhood experiences mitigate the present offense. Cf. State v. Briggs, 349 N.J. Super. 496, 504 (App. Div. 2002) (directing the trial court, on remand, to consider mitigating factor four where (1) defense counsel argued that factor at sentencing and (2) "highly relevant" psychological reports indicated that the defendant's history of continuous abuse by the victim, her husband, was "intrinsic to this defendant and to the nature of her relationship with this particular victim").

In sum, we are satisfied that the judge's weighing of the aggravating and mitigating factors was based on competent, credible evidence in the record and that ultimately, the sentence by no means "shock[s] the judicial conscience." Fuentes, 217 N.J. at 70 (quoting Roth, 95 N.J. at 364-65).

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion.  <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-1271-23